Thomas Maxwell

*v.*

The People of the State of Illinois.

*Filed at Mt. Vernon October 16, 1895.*

1. Indictment—*sufficient description of "the confidence game" in.* An indictment charging that money was obtained "by means and by use of the confidence game," sufficiently describes the offense defined in division 1, section 98, of the Criminal Code, by virtue of the express provision in section 99 that such description shall be sufficient, as well as by the general provision in division 11, section 6, making it sufficient to state an offense in the language of the statute, or so that its nature may be easily understood by the jury.

2. Confidence Game—*the term "confidence game" defined.* A swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler is a confidence game, within the meaning of the statute.

3. Same—*not limited to use of "false or bogus checks."* The offense of obtaining money "by means or by use of any false or bogus checks, or by any other means, instrument or device commonly called the confidence game," cannot be limited to the use of false or bogus checks or paper of similar kind, under the rule that general words are limited by particular words, since the words "commonly called the confidence game" show an intent to embrace any means, instrument or device which comes within the description of those words.

4. Statutes—*construction of general words in penal statutes.* General words will be construed more broadly than specific words, even in penal statutes, where such was clearly the legislative intent.

5. Trial—*confidence game—relevancy of false representations, etc., as stated in instruction.* Calling the attention of the jury to "false representation and encouragement," which were united with a trick at cards in working a confidence game, is not objectionable in an instruction to the jury, on the ground that these were irrelevant.

6. Same—*instruction—confounding of offenses.* An instruction referring to false representation and trick at cards, which were features of a swindling operation for which defendant was being prosecuted as for a confidence game, is not misleading, on the ground that it confounds the offense with false representations to obtain credit under division 1, section 96, of the Criminal Code, or games or devices by the fraudulent use of cards defined by section 100.

Writ of Error to the Circuit Court of Jackson county; the Hon. Joseph P. Robarts, Judge, presiding.

This is an indictment against plaintiff in error and one Anderson for obtaining money from one Simon P. Rudesill by means of the confidence game. The two counts of the indictment are as follows:

"The grand jurors chosen, selected and sworn in and for the county of Jackson, in the name and by the authority of the People of the State of Illinois, upon their oaths present, that Thomas Maxwell and William Anderson, late of the county of Jackson and State of Illinois, on the third day of November, in the year of our Lord one thousand eight hundred and ninety-three, at and within the county aforesaid, did then and there, unlawfully, willfully and feloniously, obtain from one Simon P. Rudesill fifteen dollars of his money, of the value of fifteen dollars, by means and by use of the confidence game, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the same People of the State of Illinois.

"And the grand jurors aforesaid, chosen, selected and sworn in and for the county of Jackson aforesaid, in the name and by the authority of the People of the State aforesaid, upon their oaths aforesaid do further present, that the said Thomas Maxwell and William Anderson, late of the county of Jackson and State aforesaid, on the third day of November, in the year of our Lord one thousand eight hundred and ninety-three, at and within the county aforesaid, did then and there, unlawfully and feloniously, obtain from one Simon P. Rudesill three United States legal tender treasury notes for the payment of fifteen dollars, the personal property, then and there, of the said Simon P. Rudesill, by means and by use, then and there, of the confidence game, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the same People of the State of Illinois."

Anderson pleaded guilty. Plaintiff in error pleaded not guilty. The only testimony introduced by the State

was that of the prosecuting witness, Simon P. Rudesill. The accused introduced no evidence. At the close of Rudesill's testimony, the defendant demurred to the evidence and moved to exclude it from the jury. The motion was overruled, and defendant excepted.' Seven instructions were given on behalf of the People, and seven on behalf of the defendant. The jury returned a verdict of guilty, fixing the punishment at imprisonment in the penitentiary for five years, and finding the age of the defendant to be twenty-six (26) years. Motions for new trial and in arrest of judgment were made and overruled, to which rulings exceptions were taken. Judgment was rendered and sentence pronounced in accordance with the verdict. The case is brought here by writ of error from this court.

The facts are substantially as follows: Rudesill, a farmer, twenty-five years old, while on his way, with his wife and child, from Cape Girardeau, Missouri, to Hamilton county, Illinois, was detained at Carbondale, Jackson county, waiting for a train to go north on the Illinois Central railroad, on November 3, 1893. While he was walking on the platform of the depot he was accosted by Maxwell, the plaintiff in error, who asked him if he was traveling, and was told that he was going north to Ashley and from there to Dahlgren. Maxwell then asked him if he would throw some bills along the road for him, bills for clothing and a lottery. He told Rudesill that he would pay him for his trouble, saying that he could take the bills, and, when the train stopped, distribute them on the platform. Rudesill agreed to do so, and Maxwell said he would go and get the bills and would be back soon. Rudesill then went back into the ladies' waiting-room where his wife and baby were. "Pretty soon Maxwell came back and took me in a little closet and showed me the secret. He had some cards,—four or five or six,—about three inches long and about an inch and a half wide, blank on one side. One had writing on

it, '500,' in figures, and below it was 'fifty cents.' Max-
well said that was fifty cents a draw; 'you draw one of
the cards and you get fifty cents' worth, or two dollars'
worth, or two dollars and a half's worth.' He showed
me a card that had a 'C' on it, that began to spell cloth-
ing, and said, 'Do you see that dot in the middle of the
'C?' I said I did, and he said that was the card to draw,
and doubled them over his hand. I took out the card,
and it had the 'C' on it, with a dot in it. Just then Wil-
liam Anderson came in, and Maxwell said something about
his not being concerned in it. Anderson said he had a
right to be there. Maxwell said, 'Well, I can show it to
him, too,' and he showed him the cards and told him to
draw. Anderson drew, and missed it. Anderson said, 'I
will bet you twenty dollars you can't draw it.' Maxwell
said: 'I will bet you thirty dollars. I have got a check
here for thirty dollars, and I will bet you thirty dollars
that I can.' Anderson said he did not want any checks
—he wanted cash—and he went down in his pocket and
got the money. I said, 'Mr. Maxwell, I can let you have
it,' and he said, 'All right,' and he took the money and
put it up. Anderson took the cards and handed them
to Maxwell to draw. Maxwell said, 'You can draw it.'
I thought all I had to do was to draw that card with a
dot in the 'C.' I could see it plain, but when I drew it,
somehow I missed. I drew the wrong card. Maxwell
said: 'Now, you damned fool, see what you have done. Go
back in the room and sit there for thirty minutes, and I
will go and get the money at the bank.' He did not come
back. He did not present the check to me. He reached
in his pocket as though he was going to bring it out.
I did not see any note, check, or anything of the kind.
I told him I would let him have fifteen dollars. I let him
have fifteen dollars, and he was to give it back to me.
I do not mean to state that he offered me any sort of in-
strument for this money. Maxwell never offered me any

bogus check or note, or bogus draft.   It was just a trick with cards with a dot in the 'C.'"

Then Rudesill went out on the platform and made some inquiries as to Maxwell.   The police, who had suspicions of Maxwell, informed him that Maxwell and Anderson had just jumped on a freight train on the Illinois Central and had gone south.   Rudesill asked the policeman to telegraph south and have them arrested, which was done.   Anderson was the partner and confederate of Maxwell.

J. F. Taylor, for plaintiff in error:

A criminal statute should be contracted by interpretation, so as to avoid punishing those who, though breaking the letter, have not violated the spirit of the law. Bishop on Stat. Crimes, secs. 227, 231.

It is familiar to the profession that where a statute creates an offense or specifies a class, and in the definition thereof a generic term is used, either preceded or followed by specific terms, the specific terms are words of limitation, and the generic term can not be extended further than the specific terms used therein.   1 Bishop on Crim. Proc. sec. 620; *Brush* v. *Lemma,* 77 Ill. 498.

All indictments upon statutes must state all the circumstances which constitute the definition of the offense in the act.   1 Bishop on Crim. Proc. secs. 611, 614.

Maurice T. Moloney, Attorney General, T. J. Scofield and M. L. Newell, of counsel, and John M. Herbert, State's Attorney, for the People:

The indictment upon which Maxwell was tried is a copy of the indictment in the case of *Morton* v. *People,* 47 Ill. 468, a reference to which case will disclose almost the identical state of facts with reference to this crime.

The literal reading of a statute may be departed from where it is required to avoid an absurdity or to carry out the manifest intention.   *Railroad Co.* v. *Binkert,* 106 Ill. 29; *Reinecke* v. *People,* 15 Ill. App. 241.

The intention is to be gathered from the necessity or reason of the enactment, and the meaning of words enlarged or restricted according to the true intent. *Cruse* v. *Aden,* 127 Ill. 231; *Castner* v. *Walrod,* 83 id. 171.

A thing within the intention is regarded as within the statute though not within the letter, and a thing within the letter not within the statute unless within the intention. *Perry County* v. *Jefferson County,* 94 Ill. 214; *People* v. *Hoffman,* 97 id. 234; *Hogg* v. *People,* 15 Ill. App. 288; *Anderson* v. *Railroad Co.* 117 Ill. 26.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

*First*—Objection is made to the indictment upon the ground, that it does not embrace in its averments every criminal fact that is material to the punishment sought to be inflicted. It is insisted, in other words, that the indictment should specify all the facts with such certainty that the offense may judicially appear to the court. We do not regard the indictment as bad for the reason thus stated.

Section 98 of division 1 of the Criminal Code, under which the indictment was found, is as follows: "Every person who shall obtain, or attempt to obtain, from any other person or persons, any money or property, by means or by use of any false or bogus checks, or by any other means, instrument or device, commonly called the confidence game, shall be imprisoned in the penitentiary not less than one year nor more than ten years." (1 Starr & Cur. Stat. p. 782, chap. 38, sec. 98).

There are two statutory provisions which justify the framing of such an indictment under said section 98 as is set out in the record in this case. The first is section 6 of division 11 of the Criminal Code, which provides, that "every indictment or accusation of the grand jury shall be deemed sufficiently technical and correct which states the offense in the terms and language of the statutes cre-

ating the offense, or so plainly that the nature of the offense may be easily understood by the jury." (1 Starr & Cur. Stat. p. 857; *Scott* v. *People*, 141 Ill. 195). The second is section 99 of division 1 of the Criminal Code, which immediately follows said section 98, and specifically refers to the crime therein described, and is as follows: "In every indictment under the preceding section, it shall be deemed and held a sufficient description of the offense, to charge that the accused did, on, etc., unlawfully and feloniously obtain, or attempt to obtain, (as the case may be), from A B (here insert the name of the person defrauded or attempted to be defrauded) his money (or property, in case it be not money), by means and by use of the confidence game." (1 Starr & Cur. Stat. p. 782). In view of the two statutory provisions thus quoted, we held, in *Morton* v. *People*, 47 Ill. 468, that an indictment, precisely like the one here, was good.

*Second*—It is claimed, that the proof in the case at bar does not describe such an offense as is defined by section 98. In support of this contention, counsel for plaintiff in error invokes the well established rule, that, where particular words of a statute are followed by general words, the general words are restricted in meaning to objects of the like kind with those specified. (Bishop on Stat. Crimes—2d ed.—sec. 245). It is, therefore, urged, that section 98, by employing the words, "by means or by use of any false or bogus checks, or by any other means, instrument or device," has reference exclusively to the obtaining of money or property by the use of false or bogus checks, or by the use of other false or bogus commercial paper, or paper of the same specific class as checks. There might be force in the application of the rule thus invoked by counsel, if it were not for the use of the words, "commonly called the confidence game," which immediately follow the word "device." These words imply, that the statute was intended to embrace any other means, instrument or device, besides the use of false or

bogus checks, which comes within the meaning of what is commonly called the confidence game. The object of the rule, embodied in the maxim, *noscitur a sociis*, that is, that the meaning of a word or phrase may be ascertained by reference to the meaning of other words or phrases with which it is associated, is to ascertain and carry out the legislative intent, and not to defeat such intent. The rule will not be applied, where its application would contravene the plain meaning of a law. (23 Am. & Eng. Ency. of Law, pp. 439, 442). "General words will be construed, even as against defendants in penal statutes, more broadly than the specific, where such appears clearly to have been the meaning of the legislature." (Bishop on Stat. Crimes, sec. 246). Although statutes imposing penalties and fines are strictly construed, yet the construction must not be so strict as to defeat the legislative intention; and accordingly we have held that, even in the case of such statutes, it is proper to apply the principle of interpretation laid down in section 1 of the act in regard to the construction of statutes, (Rev. Stat. chap. 131, sec. 1; 2 Starr & Cur. Stat. p. 2329), which provides, that "all general provisions, terms, phrases and expressions shall be liberally construed in order that the true intent and meaning of the legislature may be fully carried out." (*Hankins* v. *People*, 106 Ill. 628).

It being the evident intention of the statute to punish the obtaining, or attempting to obtain, money or property by any means, instrument or device commonly called the confidence game, it would be a very narrow construction of the statute to restrict its meaning to such devices as consist only in the use of false or bogus checks, or other commercial paper of like character. The generic or family characteristic, by which other means, instruments or devices are included within the same *genus* as the device specifically mentioned, is not so much indicated by the word, "checks," as by the words, "false or bogus." The obtaining of money by means or use of what

is false or bogus is the offense aimed at. This is further apparent from the designation, in section 99, of the victim as "the person defrauded or attempted to be defrauded."

It is difficult to give.a definition of what is commonly called the confidence game. In *Morton* v. *People*, *supra*, we said: "The nature and character of the so-called confidence game has become popularized in most of the cities and large towns, and even in the rural districts of this broad Union, and is well understood;" but no attempt was made to give any definition that should be applicable to all cases. On the contrary, speaking there of the devices referred to in section 98, we said: "As these devices are as various as the mind of man is suggestive, it would be impossible for the legislature to define them, and equally so to specify them in an indictment; therefore the legislature has declared, that an indictment for this offense shall be sufficient if the allegation is contained in it that the accused did, at a certain time and place, unlawfully and feloniously obtain or attempt to obtain the money or property of another by means and by use of the confidence game, leaving to be made out by the proof the nature and kind of the devices to which resort was had."

The popular idea of the confidence game, as understood "in most of the cities and large towns, and even in the rural districts" of the Union, is best expressed in the definition thereof in Webster's International Dictionary, and is as follows: "Confidence game is any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler." We think that the facts of this case show a swindling operation, in which advantage was taken of the confidence reposed by the prosecuting witness in the plaintiff in error, who is unquestionably shown to have been a swindler. We are, therefore, inclined to think that, under the proofs here, the offense committed by plaintiff in error was within the meaning of the language used in section 98.

*Third*—Objection is made to the first instruction given
for the prosecution upon the alleged ground, that it calls
the attention of the jury to what counsel calls irrelevant
matter.   The matter said to be irrelevant is the element
of "false representation and encouragement," which was
united with the trick at cards, in order to induce the pros-
ecuting witness to part with his money.   We think that
all the facts together constituted the "swindling opera-
tion."   When plaintiff in error represented, that he was a
commercial traveler and had advertising cards or circu-
lars to distribute, he was guilty of false representation.
He was equally guilty of false representation, when he
induced plaintiff in error to believe that Anderson was a
disinterested outside party anxious to become acquainted
with the scheme in hand, and that he himself had a check
in his pocket, and would go to the bank and get it cashed,
in order to return to the prosecuting witness his money.
In all this there was an element of false representation.
So, when plaintiff in error offered to pay the prosecuting
witness for distributing the cards or circulars, and inter-
ested him in the scheme of drawing the cards so as to
get a card calling for so much money's worth of clothing
or jewelry, he encouraged him to part with his money.
These elements of false representation and encourage-
ment were mingled with the trick of the cards in such a
way as to gain the confidence of the victim, and throw
him off his guard.

Counsel say that, by the use of the words, "false repre-
sentation" and "trick at cards," the first instruction con-
founds the offenses described in sections 97 and 100 with
the offense named in section 98.   Section 97 refers to false
representations in writing of his own respectability,
wealth, or mercantile correspondence or connections,
whereby the offender gains credit and thereby defrauds
his victim.   The instruction cannot be understood as re-
ferring to false representations of this nature.   Section
100 refers to games or devices by the fraudulent use of

158—17

cards, as explained in *Blemer* v. *People*, 76 Ill. 265.    There was here no such game of chance or trick with playing cards, as is intended by section 100.

We find no error in the record which would justify us in reversing the judgment.    Accordingly, the judgment of the circuit court is affirmed.    *Judgment affirmed.*