. Harry DuBois

*v.*

The People of the State of Illinois.

*Opinion filed December 16, 1902.*

1. Criminal law—*section 98 of the Criminal Code, concerning confidence game, construed.* The words "any other means, instrument or device," used in section 98 of the Criminal Code, concerning the confidence game, do not necessarily mean that which is actually given or exchanged for the money or property, but include the method by which the victim was induced to part with his property.

2. Same—*acts constituting a confidence game.* Inducing a person to buy worthless stock from a third party, in reality a confederate, upon the false representation that certain parties in a distant city are trying to locate such party with a view to buying the stock at a good price, which representation is corroborated by bogus telegrams sent by another confederate, constitutes a confidence game, within the meaning of the statute.

3. Same—*when evidence of similar transactions is admissible.* In a trial for obtaining money by means of a confidence game, evidence of similar transactions practiced by the accused upon other parties is admissible, not for the purpose of showing a willingness on the part of the accused to commit the offense charged, but to show guilty knowledge of which he claims to be innocent.

4. Same—*when error in admitting evidence will not reverse.* Error in admitting certain incompetent evidence will not be ground for reversing a judgment of conviction where the verdict must have been the same had such evidence not been admitted.

5. Same—*matter of requiring bill of particulars is in discretion of the judge.* Whether or not the State shall be required to furnish a bill of particulars in a criminal case rests in the sound legal discretion of the court.

6. Same—*naming of victim of a confidence game sufficiently identifies offense.* If an indictment for obtaining money by means of a confidence game names the victim, the offense is sufficiently identified, and a conviction of the offense would bar a second prosecution.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. FRANK BAKER, Judge, presiding.

R. A. WADE, and JOHN E. NORTHRUP, for plaintiff in error.

CHARLES S. DENEEN, State's Attorney, (EDWIN S. ELLIOTT, of counsel,) for the People.

Mr. JUSTICE WILKIN delivered the opinion of the court:

Harry DuBois, *alias* Harry. I. Harris, and Charles M. Fegenbush, *alias* Charles K. Thorne, were indicted by the grand jury of Cook county, at the November term, 1900, of the criminal court, for the crime of obtaining money by means and by use of the confidence game. Upon the trial at the May term, 1902, they were convicted and sentenced to the penitentiary at Joliet. Harry DuBois, *alias* Harris, alone prosecutes this writ of error.

The testimony of the prosecuting witness, Mrs. Laura G. Fixen, shows that she resided in the city of Chicago and knew both defendants. She first met Fegenbush, who called himself Thorne, early in the fall of 1900, at which time she answered an advertisement which he had caused to be published in the *Sunday Tribune,* and he called upon her. The advertisement was to the effect that any one who would invest money with him could double it or get large returns for it in a short time. When he called upon her, which was early in September, he read a letter to her which he said was from his brother in Denver, Colorado, to the effect that the brother knew certain firms there who were anxious to buy stock in a valuable mine, and Fegenbush told her that he knew where a large block of the stock was; that a man by the name of Harris had it, and that the Colorado parties had difficulty in locating him, but that he (Fegenbush) had located him and would take her to the man if she thought she wanted to buy the stock; that she could sell it to the

Colorado parties, and that he then read the names of the parties in Denver from the letter purporting to be from his brother. She told him she would go and see Harris, and they went together the same day. They found Harris about 29 Indiana avenue, in bed, with his head bundled up, claiming to be suffering from rheumatism and seeming to be in great pain. He showed her the stock and said he wanted to sell it so he could go to Hot Springs. She obtained from him an option for sixty thousand shares of stock at five cents per share, in the Ward Consolidated Gold Mine Company of Colorado, to be paid for before September 20, 1900, else the agreement should be void. Fegenbush was present at the time of the signing of the option agreement, and as soon as they left the house Mrs. Fixen went to the telegraph office and telegraphed the parties in Denver whose names had been given her, asking what they would give for the stock. In about two hours she received replies, purporting to be signed by the firms telegraphed to, each making an offer for the stock, ranging from ten to twenty cents per share for the entire block of sixty thousand shares. Upon receiving these telegrams she went the next day to see Harris, thinking it was a good investment, and taking with her $3000 in cash. She found him in bed, as before, and after some negotiations she took an assignment of the stock and paid him the $3000. She immediately took a train for Denver, and upon arriving there made inquiry for the parties whose names were signed to the dispatches received by her, and soon ascertained that there were no such persons or firms in the city,—in other words, that the dispatches were false and fictitious. She returned immediately to Chicago, and began to look for the defendants, but failed to find either of them. She then reported the case to the police, and the defendants were subsequently located in Washington City and arrested, but by some means successfully resisted the extradition papers. They were later found in the city of New York,

arrested and brought back to Chicago. They gave bond for their appearance, but their recognizance was forfeited, but they were finally brought to trial with the result above mentioned.

It is clear, not only from the testimony of Mrs. Fixen, but from that of the defendants themselves, that the whole scheme was a plot to obtain the money of Mrs. Fixen by fraudulently obtaining her confidence and inducing her to believe that the worthless shares of stock held by Harris were of great value. That the dispatches sent by her from Chicago to Denver, inquiring what the stock could be sold for, were answered by a confederate of the defendants is perfectly clear. Fegenbush virtually admits it by saying, "I don't know that I had a confederate in Denver to answer these telegrams." In short, the evidence is overwhelming that the defendants, acting together, by false and fraudulent means, commonly known as the confidence game, obtained the money of the prosecuting witness.

Counsel for plaintiff in error admit that the conduct of defendants was criminal, but seek to show that the crime committed was that of obtaining money by false pretenses, and not a violation of the statute against obtaining money by means of the confidence game, the argument being, that the "means, instrument or device" used was not such as is contemplated by the use of those terms in the statute, and therefore the evidence fails to support the verdict. Section 98 of the Criminal Code (Starr & Cur. Stat. 1896, p. 1280,) is as follows: "Every person who shall obtain, or attempt to obtain, from any other person or persons, any money or property, by means or by use of any false or bogus checks, or by any other means, instrument or device, commonly called the confidence game, shall be imprisoned in the penitentiary not less than one year nor more than ten years." The words, "*or by any other means, instrument or device,*" were intended by the legislature to embrace any other means,

instrument or device, than false or bogus checks, which comes within the meaning of what is commonly called the confidence game. (*Maxwell* v. *People*, 158 Ill. 248.) "Confidence game is any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler." (Webster International Dic.) This definition was quoted and adopted in *Maxwell* v. *People*, *supra*. The Century Dictionary and Cyclopedia, (vol. 2, p. 1183,) defines confidence game as "a kind of swindle, practiced usually in large cities, upon unwary strangers."

It is further said by counsel for plaintiff in error "that the means, instrument or device relied upon by the State as indicating guilt must be that which is actually given or parted with for the money or property of another, and therefore the proximate cause inducing such person to part with his money or property." This proposition is clearly unsound. The confidence game is most frequently practiced by the use of cards, dice or other means, instrument or device, in which game the victim gets nothing, but is simply swindled out of his money by a trick, as was the case in *Maxwell* v. *People* and *VanEyck* v. *People*, 178 Ill. 199. The means used in this case were to our minds clearly within the inhibition of section 98. While the point was not raised in *Morton* v. *People*, 47 Ill. 468, the language of Chief Justice Breese, who rendered the opinion in that case, clearly sustains the view here expressed.

Two witnesses were introduced by the prosecution, Berlizheimer and Brewer, and allowed to testify, over the objection of counsel for the defendants, to certain transactions by DuBois similar to the one practiced upon Mrs. Fixen, and that ruling is assigned for error. In so far as that testimony tended to show a willingness on the part of the defendant DuBois to commit other offenses similar to the one charged in the indictment it was incompetent, as repeatedly held by this court; but it is claimed by counsel for the People that it was not

200—11

offered for that purpose, but to prove that said DuBois had guilty knowledge. The first witness says: "I know the defendant DuBois. I first saw him about the last of April or the first of May last year. I read the ad. in the *Tribune.* The ad. stated that by a two thousand dollar investment there would be $6000 or $8000 made within a few weeks without any risk whatsoever, and a sure case. The first thing he said when he came to the house was, that he had a brother in a large brokerage house in Denver. He wrote to him that by chance he had found out that there was a mine that contained a good deal of valuable gold, and he thought they could work that privately themselves without the concern in Denver knowing anything about it." He then goes on to detail a scheme proposed by DuBois as to sending dispatches, getting answers, etc., similar to that presented to Mrs. Fixen by Fegenbush. Brewer testified that he knew both the defendants, and that he saw DuBois first. He says: "He came to my office in the last of July, 1900. I didn't know him before that. He came in with a friend of his and said they had been sent by a friend of mine. The man who was with him went by the name of Ford. DuBois said his name was William Davidson. My clerk was there. He heard part of the conversation. DuBois said he had some stock hypothecated with some dealer in Dearborn street, and that he had been advised that the stock was becoming valuable and he wanted to get it out. He said it would require $500, and interest, to redeem the stock certificate, and that he had offers from several parties in Denver at a much advanced figure for the stock, and asked me if I would help him out to the extent of getting this stock out for him and sending it out to Denver. He showed me correspondence and gave me the names of parties in Denver to whom he was going to sell. He gave me the name of Haskell, Tripp & Bey, in Denver, in the Equitable Building." This was the name of one of the firms which was given Mrs. Fixen

by Fegenbush. The witness proceeds: "So I wired to Haskell, Tripp & Bey and received a response from them. I have it here. I got it the same day. I just wired would they honor a sight draft for this stock certificate." By this means Brewer was induced to advance the money to redeem the certificate. The dispatch from the Denver firm proved a forgery, as did those sent Mrs. Fixen, and Brewer lost the money which he invested. This testimony tended very strongly to show that DuBois knew all about the means used by his confederate, Fegenbush, in obtaining the money from the prosecuting witness, and was not, as he claimed to be, the honest, innocent holder of the sixty thousand shares of stock, which he simply sold without any knowledge of the conduct of Fegenbush. We think the evidence was clearly competent against DuBois, and he alone is complaining of its admission.

The court, by an instruction to the jury, informed them that the evidence could not be considered as tending to prove that it was likely or probable that defendants committed the offense charged in the indictment, "but these facts may be considered by the jury, together with and in the light of all the facts and circumstances proved in the case, as evidence which may tend to show that the defendants knew the stock was false or worthless." Although evidence may tend to prove a defendant guilty of an offense not charged in the indictment, it is not for that reason incompetent if it fairly tends to prove the offense charged in the indictment. (*Farris* v. *People*, 129 Ill. 521; *Williams* v. *People*, 166 id. 132; *Bottomly* v. *United States*, 1 Story, 135; *Cook* v. *Moore*, 11 Cush. 213.) Many other cases might be cited to the same effect. But even if the testimony of these two witnesses could be said to be incompetent, still, in view of the other evidence the competency of which is not questioned, its admission could not be regarded as reversible error. "In cases where the evidence clearly justifies the finding, and it

must have been the same had not certain incompetent evidence been admitted, the error in its admission will be no ground for a reversal." *Jackson* v. *People*, 126 Ill. 139; *Williams* v. *People, supra.*

A motion was made by the plaintiff in error to rule the prosecuting attorney to furnish a bill of particulars, which was denied, and this is assigned for error. Without reference to the point made by the People that the motion was too late, it was properly denied. It is well understood that whether or not the State shall be ruled to furnish a bill of particulars in a particular case is a matter within the sound legal discretion of the court. Here we are at a loss to perceive wherein a bill of particulars was necessary in order to protect the rights of the defendants. In *Morton* v. *People, supra,* on the question whether it was sufficient to charge the crime in the language of the statute, it is said (p. 473): "It is insisted by counsel for the plaintiff in error that the accused can not know, from this indictment, the exact charge against him and the outer lines within which the evidence must be confined, and cannot know what evidence he will be required to meet; nor could a conviction under this indictment be pleadable in bar of another indictment for the same offense, nor can the court see in it that a legally defined crime has been committed. They insist that the term 'confidence game' has no definition 'in law or literature,' and that 'no fifty men can be found who will define alike the confidence game.' They further insist that the indictment should specify all the facts with such certainty that the offense may judicially appear to the court." After referring to the statute, the second section of which provides "that in every indictment under this act it shall be deemed and held a sufficient description of the offense to charge that the accused did, on, etc., unlawfully and feloniously obtain, or attempt to obtain, (as the case may be,) from A B his money by means and by use of the confidence game," it is further said: "The

nature and character of the so-called confidence game has become popularized in most of the cities and large towns, and even in the rural districts of this broad Union, and is well understood, and this defendant was distinctly apprised by the indictment of what he was called upon to defend. The accusation is sufficiently identified by the name of the victim. This name must appear in every indictment on this statute, and appearing there no second indictment for the same offense could be successfully prosecuted. The conviction on this indictment could be always pleaded in bar of a second. We are of opinion that the offense is so set forth in the indictment that the accused can be at no loss to know what it is with which he is charged, and can so prepare his defense." And so in this case, the judgment of conviction here sought to be reversed could be successfully pleaded in bar of a second prosecution for the same offense. It is idle to say that a bill of particulars was necessary in order to enable the defendants to prepare their defense. When they were apprised of the fact that they were charged with obtaining money of Laura G. Fixen by means and use of the confidence game, they were apprised of every fact connected with that transaction, as they clearly show by their own testimony in attempting to relieve it of its criminality.

Complaint is made of the conduct of the court in making remarks, during the trial, prejudicial to the rights of the defendants. We think this point is without substantial merit. He instructed the jury fully and fairly as to the law of the case, and, we think, protected the defendants in all their legal rights, securing them a fair and impartial trial.

The judgment of the criminal court is clearly right, and it will be affirmed.          *Judgment affirmed.*