## EDGAR C. HUGHES

### *v.*

## THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed October 23, 1906—Rehearing denied Dec. 6, 1906.*

1. CONFIDENCE GAME—*what constitutes a violation of the statute.* Section 98 of division 1 of the Criminal Code, relating to the confidence game, is violated whenever one person by his course of conduct has led another to repose confidence in him with a view to obtaining the money or property of such other, and which is obtained by a betrayal of the confidence so reposed.

2. SAME—*confidence game includes advertising schemes.* The confidence game, within the meaning of the statute, includes an advertising scheme whereby the victim is led to part with his money in the belief that he is being employed in a legitimate business by the advertisers, who falsely represent themselves to be a legitimate business concern, and make such false displays and representations as lead the victim to repose confidence in their statements and in their alleged business enterprise.

3. APPEALS AND ERRORS—*errors not pointed out in printed brief are waived.* Under Supreme Court rule 15 (204 Ill.,13) no error relied upon for reversal which is not pointed out in the printed brief of the appellant or plaintiff in error can be afterwards raised, either by reply brief, oral or printed argument, or on petition for rehearing.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE A. DUPUY, Judge, presiding.

JOHN E. W. WAYMAN, for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN J. HEALY, State's Attorney, (FLETCHER DOBYNS, of counsel,) for the People.

Mr. JUSTICE HAND delivered the opinion of the court:

At the January term, 1906, the grand jury of Cook county returned an indictment into the criminal court of said county against Edgar C. Hughes, L. D. Abbott, A. M.

223— 27

Reed and C. E. Powers, charging them with obtaining from Walter Foster a check for the sum of $200 by means and by use of the confidence game, in violation of section 98 of the Criminal Code, (Hurd's Stat. 1905, p. 692,) which reads as follows: "Every person who shall obtain, or attempt to obtain, from any other person or persons, any money or property, by means or by use of any false or bogus checks, or by any other means, instrument or device, commonly called the confidence game, shall be imprisoned in the penitentiary not less than one year nor more than ten years." C. E. Powers was not arrested, a *nolle prosequi* was entered as to A. M. Reed, L. D. Abbott was acquitted, and Edgar C. Hughes was found guilty by the jury and was sentenced by the court to the penitentiary, and he has prosecuted a writ of error from this court to the criminal court of Cook county to reverse said judgment of conviction.

It appears from the record that the firm of L. D. Abbott & Co., of which the plaintiff in error was a member, on June 4, 1905, caused to be published in the *Chicago Tribune* the following notice:

"Office man for manufacturing company as city manager; salary and commissions; will net $3000 a year; $200 cash bond and references required. Address E-364 *Tribune* office."

—that Walter Foster, who resided in the State of Michigan, saw said notice and replied thereto by mail, whereupon he received an answer to his reply written upon the letter-head of L. D. Abbott & Co., inviting him to call at the office of L. D. Abbott & Co. in the city of Chicago; that there was printed upon said letter-head a statement that L. D. Abbott & Co. were engaged in manufacturing corsets, petticoats and dress skirts, and that said firm had a capital of $100,000 and a surplus of $60,000; that Foster called at 381 Wabash avenue, in the city of Chicago, where he first met Powers and subsequently Hughes; that Powers and Hughes were in charge of the office, and represented to Foster that L. D. Abbott & Co. were manufacturing corsets, petticoats and

dress skirts; that they were interested in the Reliance Corset Company of Jackson, Michigan; that they had another factory in the southern part of the city, on Forty-seventh street, and that they were installing machinery at 381 Wabash avenue to get out rush orders. They also showed to Foster samples of English woolen, and informed him they had bought the entire output of an English mill for a year; that they had numerous persons in their employ taking orders for corsets, petticoats and dress skirts, and that some of the women in their employ selling these articles were making from $200 to $250 per month, and proposed to employ Foster as manager at a salary of $100 per month, and to pay him a five per cent commission on all goods sold by agents appointed by him, and to allow him $18 per week for traveling expenses, and he was to have charge of their business in the State of Pennsylvania, which they represented to him they were just establishing. They also agreed to furnish him transportation to Pittsburg. As a prerequisite to said employment they required Foster to make a cash deposit with L. D. Abbott & Co. of $200, to secure L. D. Abbott & Co. against loss upon moneys or property belonging to said firm, entrusted to Foster as the representative of said firm. After several days' negotiations a contract was executed between Foster and L. D. Abbott & Co., and Foster delivered to Hughes a check for $200, which check was subsequently collected by L. D. Abbott & Co. After Foster had executed the contract and delivered said check to L. D. Abbott & Co., said firm, through Hughes, refused to furnish Foster transportation to Pittsburg. Foster, however, went to Pittsburg, rented an office and advertised for business. The business of Foster was to appoint district representatives and canvassers for L. D. Abbott & Co. He appointed three district representatives and a number of canvassers. He soon, however, became satisfied the business of L. D. Abbott & Co. was not legitimate, and returned to Chicago and called upon L. D. Abbott & Co. and sought to cancel his

contract of employment, and requested that L. D. Abbott & Co. return to him the cash deposit of $200 made with said firm, and he would return to the district representatives and canvassers appointed by him in Pennsylvania the amount of money collected by him from them. Hughes, on behalf of L. D. Abbott & Co., declined to return to Foster said $200, relying upon a provision found in the printed part of the contract, that said $200 was in payment of certain samples which had been delivered to Foster by L. D. Abbott & Co., which provision was contrary to the arrangement made by Foster with said L. D. Abbott & Co.

Edgar C. Hughes did not testify as a witness, but L. D. Abbott was a witness in his own behalf. He testified that his home was in St. Louis, Missouri, and that he was a man of wealth; that he became acquainted with Hughes in that city, who was then preaching in a mission church and was without means; that subsequently Hughes located in Chicago and applied to Abbott to allow him to use Abbott's name in his business; that Abbott consented that Hughes might use his name in his business if he would contract no debts; that Abbott put no money into the business; that L. D. Abbott & Co. had no manufactories in Chicago, and that all the property said firm had outside its office furniture, that he knew of, was a sewing machine, which was kept at the office at 381 Wabash avenue. It also appeared that the samples of corsets, petticoats and dress skirts furnished Foster were almost worthless, the corsets being of the value only of from thirty-nine to fifty cents, the petticoats from $1.50 to $1.95, and the dress skirts from $1.49 to $1.98.

That the plaintiff in error, acting for and on behalf of L. D. Abbott & Co., of which firm he appears to have been the active member, obtained a check for $200 from Foster by deception and misrepresentation there can be no question. The only question presented upon this record open to debate is, do the deception and misrepresentation practiced upon Foster by L. D. Abbott & Co., through Powers and Hughes,

whereby Foster parted with said check, fall within the inhibition of the statute hereinbefore set forth as constituting the confidence game?

In *Maxwell* v. *People*, 158 Ill. 248, it was said: "It is difficult to give a definition of what is commonly called the confidence game." And in *Morton* v. *People*, 47 Ill. 468: "These devices are as various as the mind of man is suggestive." In the *Maxwell case*, Webster's definition of the offense was adopted, and it was there held that the "confidence game is any swindling operation in which advantage is taken of the confidence reposed by the victim in the swindler." That definition was again approved in *DuBois* v. *People*, 200 Ill. 157.

We think it clear, where a party has by a course of conduct led his victim to repose confidence in him with a view to take advantage of such confidence and to obtain the money or property of his victim by a betrayal of such confidence, and advantage is taken of the confidence reposed by the victim in the swindler, and the swindler obtains, by reason of the betrayal of such confidence, the money or property of his victim, the statute has been violated. In this case plaintiff in error, by a notice published in a newspaper, represented that a manufacturing company desired to employ a manager, and that such employment would net the person obtaining the situation $3000 per year. Through that advertisement Foster was lured to the office of L. D. Abbott & Co. There he was led to believe that L. D. Abbott & Co. controlled a large amount of wealth,—that is, had a capital stock of $100,000 and $60,000 surplus,—and had, or was interested in, large manufactories in this and foreign States, and that the firm was handling the entire product of a large English woolen mill, and that the people in its employ were monthly making large sums of money. Clearly these representations were made with a view to inspire confidence in Foster that L. D. Abbott & Co. had the ability to perform their contract, and that the proceeds of the $200 check which

Foster was finally induced to part with would be safe in the hands of L. D. Abbott & Co. and would be returned to him. That said statements were clearly false and served the purpose of enabling the plaintiff in error and his co-defendants to obtain the money of Foster there can be no question. We think, therefore, the means used in this case to obtain Foster's money fall within the inhibition of the statute, and in law amounted to what is commonly known as the confidence game, as defined in the following cases: *Morton* v. *People, supra, Maxwell* v. *People, supra,* and *DuBois* v. *People, supra.*

The counsel for plaintiff in error, on the oral argument in this court, devoted much of his time to a criticism of one or more of the instructions given on behalf of the People, and in an attempt to demonstrate that the giving of said instructions constituted reversible error. In the printed brief filed on behalf of plaintiff in error no reference is made to the instructions given on behalf of the People and no grounds of criticism are offered against any of the instructions given on behalf of the People. Rule 15 of this court provides the brief of appellant or plaintiff in error shall point out "the errors relied upon for a reversal," and "no alleged error or point not contained in such brief shall be raised afterwards, either by reply brief, or in oral or printed argument, or on petition for rehearing." As the questions raised on oral argument with reference to the People's given instructions were not raised by plaintiff in error in his brief he could not raise those questions on the oral argument, and they will not here be considered.

Finding no reversible error in this record the judgment of the criminal court of Cook county will be affirmed.

*Judgment affirmed.*