FRANK C. LORY

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed October 23, 1907.*

1. CONFIDENCE GAME—*what constitutes a fatal variance.* An indictment for the confidence game which charges that the defendant feloniously obtained from a certain person "$400 of good and lawful money of the United States" is not sustained by proof that the defendant obtained a check for $300, since proof of obtaining a check is fatally variant from a charge of obtaining money.

2. SAME—*what does not constitute the confidence game.* A sale of mining stock in an undeveloped mine is not converted into the confidence game by the failure of the mine to prove successful, where all the representations of the vendor as to the material facts, including the location and ownership of the land and the presence of gold therein, were true, although his opinion as to the possibilities of the mine and the future value of the stock proved to be greatly exaggerated.

WRIT OF ERROR to the Circuit Court of Vermilion county; the Hon. E. R. E. KIMBROUGH, Judge, presiding.

J. B. MANN, and W. C. LINDLEY, (A. H. TAYLOR, and J. W. JAMISON, of counsel,) for plaintiff in error.

W. H. STEAD, Attorney General, and J. W. KEESLAR, State's Attorney, (W. T. GUNN, of counsel,) for defendant in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

The plaintiff in error was indicted and convicted for obtaining $400 from Henry Lloyd by means of the confidence game, and has sued out a writ of error to reverse the judgment.

The indictment alleges that the plaintiff in error "did unlawfully and feloniously obtain from one Henry Lloyd

$400 of good and lawful money of the United States." The proof shows that what he obtained was a check for $300. This is a fatal variance. In the case of *Goodhue* v. *People,* 94 Ill. 37, the defendant was indicted for the embezzlement of money belonging to the county but the proof showed that the embezzlement consisted in the taking of county orders, and on page 48 we said: "The indictment charged the embezzlement of money and did not charge the embezzlement of county orders. If this disposition of the county orders was made criminal, it constituted either the larceny or the embezzlement of county orders, and not of money. * * * It is plain that if crime was committed by the accused in this transaction in relation to what are called the 'jail orders,' as presented by the proofs, it was not the embezzlement of the proceeds of the orders but the embezzlement or larceny of the orders themselves. If a man steal a horse and sell him to a stranger, he may be convicted of stealing the horse but not of stealing the money received as the price of the stolen horse." In *Weimer* v. *People,* 186 Ill. 503, it was said (p. 507): "If it was true that Weimer receipted for and received from the town collector, as money, the amount mentioned, in town orders, it could not be charged up to him in this case, and he could not be legally convicted of embezzling or converting to his own use their face value as money. There was no evidence that he embezzled the town orders, and if there had been, he could not have been convicted of it under the charge of embezzling money." So in an indictment for larceny or receiving stolen property, where there is a specific charge that the money stolen was of a certain kind and denomination, it is essential that the proof should sustain this allegation of the indictment. *Williams* v. *People,* 101 Ill. 382; *Vale* v. *People,* 161 id. 309.

Whether or not it was essential to allege in the indictment that the property obtained was good and lawful money of the United States, yet if it was so particularly alleged that

allegation would not be sustained by proof that the accused obtained a check for the money.

But the evidence is not sufficient to sustain a conviction for obtaining either money or check by means of the confidence game. The plaintiff in error in November, 1900, sold to the prosecuting witness one hundred shares of the stock of the Dominion Gold Mining Company, which was organized in that same month in Vermilion county, Illinois, with a capital stock of $750,000. Lory was the treasurer of the company, and Mr. Lloyd testified that Lory told him that the mine was very rich; that they had bored holes down to the gravel and it paid $3.85 to the pan and would make a man some money. It would pay ten per cent the first year, thirty per cent the next and in three years would be at par. Lory would guarantee it, and if Lloyd was dissatisfied would take the stock back any time and pay him ten per cent on it. Lory said the mine was already working. They had a flume and iron pipes so as to wash the gold out of the gravel. They had a road there and a good deal of timber to make necessary improvements, and several houses. Lloyd testified that he had faith in the representations made, relied upon the guaranty and bought one hundred shares at $30 per share. In the summer of 1902 Lindley, Gundy and Miller, who were citizens of Vermilion county and stockholders in the corporation, visited the mine for the purpose of inspecting it in order to ascertain its value. They were witnesses for the State, and testified that the corporation owned about 320 acres of land in a valley, the bottom lying between the hill and the Dominion river. They found a bunk house, cook house, tool shop, dam and flume. There were four or five men working about the flume and ditches and getting the muck off of the gravel. A ditch had been constructed along the hill and the water had been brought down to where they were washing off the muck, then into a flume and through smaller troughs to different points. The flume was about one-half a mile long

and they had cleared a space about 40x100 feet down to the gravel. They had not washed any in the sluice boxes at that time. The gold was principally on the bed rock at the bottom of the gravel but there were signs of gold through the gravel. Above the gravel was an accumulation of frozen moss and dirt, called "muck," from nine to eighteen feet deep, and this was washed off by the stream of water through the flume.

This is substantially all the evidence offered in support of the conviction. At the time of the sale of the stock to Lloyd the mine was merely being developed. The next two seasons were spent in prospecting, building houses and constructing the flume and ditches. The gold was supposed to be below the muck, very little of which had been removed. All the representations of fact in regard to the mine made by Lory were true. The corporation had the land, houses, flumes, the mine was being prepared to be worked and gold was evidently there. After the sale of the stock to Lloyd, and after the visit of Lindley, Gundy and Miller, the corporation continued to develop the mine and attempted to get out gold. A steam shovel to be used in removing the muck from off the gravel was purchased at an expense of $9000 and shipped to the mine. Considerable gold was taken out of a mine immediately adjoining. The stock bought by Lloyd was stock in an undeveloped mine. He was not misinformed as to the property. Lory may have had an exaggerated notion of its possibilities, but there is nothing to show that his optimistic estimate was not honestly entertained or that it was unreasonable. The question of the amount of gold which would subsequently be taken out of the mine was necessarily a matter of opinion, as was that of the future value of the stock. Lloyd relied upon Lory's guaranty, and he was not deceived by any course of conduct of the latter into reposing confidence in him or misled by any device, scheme or swindling operation in which advantage was taken of his confidence. The fact

that, contrary to their expectations, the operation of the mine by the company proved a failure does not convert the sale of the stock into a confidence game.

The judgment will be reversed.

*Judgment reversed.*