THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CHRISTIAN P. BERTSCHE *et al.* Plaintiffs in Error.

*Opinion filed October 16, 1914—Rehearing denied Dec. 3, 1914.*

1. CRIMINAL LAW—*confidence game statute is not void as being uncertain.* The fact that the means used in swindling may be many and varied does not warrant holding the confidence game statute void as being uncertain.

2. SAME—*a bank draft or a delivered check is property.* A check in the hands of the maker is not property, because delivery is an essential part of the complete execution of the instrument, but a delivered check or bank draft is property.

3. SAME—*fact that a swindling scheme takes form of business transaction is not material.* Where the evidence shows that the defendants took advantage of the confidence reposed in one of them by a third person and defrauded the latter of her property by a swindling scheme, it is no defense that such scheme took the form of a business transaction.

4. SAME—*no physical means of deception are necessary to constitute the confidence game.* In Illinois no physical means of deception, such as the use of bogus checks or other means, instruments or devices, are necessary to constitute the confidence game, but it is sufficient if the swindling operation is carried out by means of false verbal representations, pretensions or statements.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding.

BENEDICT J. SHORT, for plaintiffs in error.

P. J. LUCEY, Attorney General, and MACLAY HOYNE, State's Attorney, (C. H. LINSCOTT, of counsel,) for the People.

. Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

An indictment against the plaintiffs in error, Christian P. Bertsche, *alias* B. P. Christy, and Charles T. Crane, *alias* James Ryan, was returned into the criminal court of Cook county. It contained three counts, and in the first charged that the defendants obtained from Hope L. McEldowney United States treasury notes, bank bills and silver of the value of $15,000, and a draft of the value of $12,500, by means and by use of the confidence game. The second count charged a conspiracy to unlawfully obtain money and property of Hope L. McEldowney of the value of $15,000 by means and use of the confidence game, and the third count charged the larceny of a draft of the value of $12,500 and lawful money of the value of $15,000. Upon the trial the jury returned a verdict applicable to the first count, finding each of the defendants guilty of the confidence game in manner and form as charged in the indictment, and the court sentenced the defendants in accordance with the verdict.

Money and drafts amounting to $15,500 were obtained from Hope L. McEldowney by the defendant James Ryan by fraud and deceit, and the fact was not disputed. He was the principal actor in the fraudulent scheme by which the money and drafts were obtained, and the defendant Christian P. Bertsche was charged as an accessory before the fact and therefore a principal. The evidence of the

transactions of the defendant James Ryan with Hope L. McEldowney was, in substance, as follows:

In January, 1913, Hope L. McEldowney, a widow, forty-two years old, arrived in Chicago from Davenport, Iowa, where she had graduated from a school of chiropractics, which professes to teach a method of curing disorders by a treatment of the spine. She saw in the *Sunday Examiner,* a newspaper published in Chicago, the following advertisement of the defendant James Ryan under the style of Prof. C. T. Crane:

"Prof. C. T. Crane, clairvoyant, permanently·located and favorably known in Chicago for the past eleven years for his marvelous foresight and accurate advice upon the problems of life in their multifarious details, such as love, courtship, marriage, investment, speculations, patents, insurance, journeys, changes, property, etc. Positively re-unites the separated, causes speedy marriages, removes evil influences, develops mediums, etc., and immediately brings about every ambition and·wish, and saves you the saddest words that pen ever wrote: 'It might have been.' Full and complete reading to-day, only 50 cents. Hours 10:00 to 6:00 P. M. 204 North State street, corner of West Lake street, one block north of Marshall Field's. All 'L' trains stop at the door."

She went with a friend, Nellie Hoople, to the place named in the advertisement and was ushered by a doorman into a reception room, where she found a number of ladies waiting for the professor to solve the problems of life by his marvelous foresight, and after a time she was admitted to the defendant. By his direction she wrote a number of questions on a slip of paper. She was in doubt whether to locate in California or Florida, and one of the questions asked for his advice which it would be best to do. The paper was folded up and the professor was supposed not to see the writing, but he did see it by some method, as he admitted, and another fortune teller testified that they saw the questions by switching the papers. He held the paper to his forehead and answered the questions. He said the trip to California would not be successful, that she would not be happy, and that Chicago would be a bet-

ter place to make money. He asked her if it was really necessary for her to practice chiropractics as a livelihood, and she told him it was not, and he ascertained that she had considerable property, amounting, as he said, to $125,-000 or $130,000. He told her that she should be a very happy and successful woman, but an evil influence was following her and he would like to remove that. He charged her fifty cents for what he called the "reading" and $20 for removing the evil influence. He asked her to come to his office and talk about it with him, and on the second visit he asked her about her investments. She had lived at West Salem, Wisconsin, where she had been assistant cashier in a bank. She told him that she was getting five per cent on her mortgages, and he said that he could invest her money and make a great deal more. He gave her a book on psychology and mental thought, and she reported afterward that she was progressing and feeling much better. She called on him frequently and he was very attentive to her and their relations became very intimate. He telephoned her many times a day and asked her how she was feeling, and she would tell him that she was feeling better. She saw him nearly every day, and he sent her flowers, books and bon bons and presented her with a diamond ring. At first she stopped at a hotel, where he called on her very often and took her to dinners and suppers, and he also gave her daily automobile rides and took her to theaters. After a time she changed her location from the hotel to rooms at 2507 Michigan avenue, where the same relations existed between them. Soon after the acquaintance was formed he told her that his father and he had a broker on the board of trade who supervised all their investments, and he would like to prove to her how easily he could make a good profit on a small sum. She gave him a draft for $400 drawn by the LaCrosse County Bank of West Salem on a bank in Chicago and $100 in cash. He made no investment, but in about a week brought her $121

and said that was the result of the investment of the $500. About February 13, 1913, she gave him another; draft, for $2500, to be invested on the board of trade. He said they never took money without giving collateral of some sort, and on each occasion gave her his note for the amount received. Some days later he told her that Murray, who was in high esteem and employ of James J. Hill, of the Great Northern railroad, was in Chicago and in close conference with himself and his father for three days, and had told them about some bonds and advised them to get Great Northern railroad bonds, and that he and his father were going to take a good many of them and they would be a better investment for her money than on the board of trade. He showed her a bundle of bonds which he said were worth about $7500 and belonged to him. He said that he and his father had helped a great many people and had done a great deal of good in the world; that God had given him a marvelous gift and he had never abused that gift, and if he did anything wrong the gift would be taken from him. He said he lived with his father and sisters and brothers on Sheridan road and was a single man, all of which was false. On the representation that he would buy bonds for her she procured another draft from the same bank for $12,500 and gave it to him on March 3, 1913, to buy the bonds. The bonds did not come, and he showed her what purported to be a telegram from New York that the man authorized to sign the bonds was attending the inauguration at Washington, and as soon as the man returned the bonds would be signed and sent to him. He had proposed marriage to her, and it was agreed that they should go to New York and be married. He turned the draft for $12,500 over to his confederate, and he started with her ostensibly for New York, but on the way told her that his father had requested him to stop in Indianapolis to attend to an estate worth about $400,000 in which he was interested. They stopped at Indianapolis

and stayed at a hotel as husband and wife for two days while he claimed that he was trying to find a judge, and he then said that there was important business for him back in Chicago and they would have to go back and start again the next week for New York. They left Indianapolis the evening of March 6 and took a compartment and arrived in Chicago on the morning of March 7. She then went to West Salem and had some news which caused her to come back to Chicago, when he had disappeared and the rooms at 204 North State street were vacant. While he had her away at Indianapolis the draft was collected, and it is a fair inference that it was a part of the scheme that she should be absent from Chicago at that time. On April 18, 1913, Ryan was arrested in Mannsville, Wyoming. He resisted extradition, and Mrs. McEldowney went to Wyoming to identify him in a *habeas corpus* proceeding. At the hearing he testified that he had never lived in Chicago, that he was never there more than two days at a time and that he never went by the name of C. T. Crane. He was remanded to the sheriff and sued out a writ of *habeas corpus* from the Supreme Court of the State, and there gave the same testimony, which is admitted to have been false. He never made any investments of the money or the proceeds of the drafts and never intended to, but claimed that he gave the drafts to his brother, Frank Ryan.

The testimony of the defendant Ryan did not tend to relieve him of the charge made against him, although he denied some of the statements of Mrs. McEldowney. He did not deny obtaining the money or the drafts or that he disposed of them as claimed, but testified that he told Mrs. McEldowney that he was married but he and his wife were not congenial, and she asked him when his wife was going to get a divorce, so that they could be married as they had agreed. In fact, he was living with his wife in Chicago at the time and there was no intention of having a divorce. He testified that he read the questions that

Mrs. McEldowney wrote on the .paper, and he gave the same account of their relations as she did. He said that he took dinner with her at her hotel thirty or forty times in January and February, and she told him he was spending too much money with her and suggested that she pay half the expenses and gave him the first $500 on that account. He said that she asked him if his wife was holding out for a money consideration, and gave him the draft for $2500 to settle with her and to make arrangements for a divorce and he was to go to Wyoming to see his wife for that purpose, and if there was any money left the balance was to be used in a business venture of clairvoyancy and chiropractics. He said that she gave him the draft for $12,500 for investment by his brother in a copper mine in Mexico. According to his own account the draft for $2500 was obtained by falsehood and fraud, and, of course, the story about attempting to make an arrangement for a divorce was inconsistent with the fact that he agreed to go to New York to be married, and started for that pretended purpose, when he had been living with his wife in Chicago.

There was much other evidence which was objected to, but it was competent, as against the defendant Ryan, to show guilty knowledge and intent. (*DuBois* v. *People,* 200 Ill. 157; *Juretich* v. *People,* 223 id. 484; *People* v. *Weil,* 244 id. 176.) It was also competent as against the other defendant, Christian P. Bertsche, to show such knowledge and intent, and also to prove that he aided, abetted and assisted the commission of the crime. He took the drafts obtained from Mrs. McEldowney and collected them, and his defense was that they were cashed by him in the ordinary course of business and not as a party or participating in the crime. He kept a saloon near the city hall, and testified that he cashed drafts for from $3000 to $7000 every day, and on pay-day cashed from $15,000 to $20,000 for pay of policemen and city hall employees, and

that he had nothing to do with the fortune-telling business. The saloon was headquarters for a number of fortune tellers with whom Bertsche was connected and who had a code which he understood. The place where fortune tellers operated was called a "store;" a prospective client a "book;" a victim who was doing business was called a "38;" and "3" meant the police. Frank Ryan, a brother of the defendant James Ryan, was one of the fortune tellers operating under the name of Robert Milton at 1316 Michigan avenue, in the house owned by Mrs. Eisner, and the defendant James Ryan, who had been operating in other places, came to Chicago and went to work at this place under the same name in August, 1912, and operated there until some time in October. During that period Eddie McCabe and one Collins also worked there under the same style. Bertsche repeatedly visited the place and looked over the card index of persons who visited the professors, and he was always there on Saturday night and discussed the amount of business being done, the matter of advertising, and at one time money was counted out on the table and Bertsche put part of the money in his pocket. Bertsche attended a dinner at Mrs. Eisner's where all the fortune tellers were present and their business was the subject of discussion. A doorman who came to Chicago in December, 1912, worked for a fortune teller named Wagg, operating as Prof. Salisbury at 1710 Michigan avenue but whose real name was Charles Durnback. The doorman made daily reports to Bertsche of the work of Wagg as a fortune teller, and when Wagg moved out one Long moved in under the same name of Prof. Salisbury, and the doorman made daily reports to Bertsche concerning Long's business. Walter Russell, a fortune teller, operated in Chicago from September 1, 1912, to about December 20, at 1128 Michigan avenue. Bertsche arranged for him to come to Chicago and promised to have a "store" for him when he arrived. He took the name of Stone and suc-

ceeded David K. Ross, who moved out leaving the furni-- ture, and Russell moved in, taking the place just as Ross left it. This place was owned by Miss Quan, and Bertsche told Miss Quan he would put a professor in her place and would pay the same rent as the others paid, and said it was a pity to leave that place empty as it was so good for the suckers,—they tumbled right in. He brought a Prof. Snow to Miss Quan on January 2, 1913. The fortune teller Russell had just vacated the place. Russell undertook to operate on his own responsibility and Bertsche assaulted him, and after knocking him down took a pair of hair clippers and cut a cross in the hair on his head, and told Russell that he would show him that he couldn't go over his head and start in business without his consent.

James Ryan left 1316 Michigan avenue the first part of November, 1912, and established the office at State and Lake streets, and the following evidence shows the method of the fortune tellers with whom Bertsche operated: Mrs. A. M. Case, a widow over seventy years old, in the employ of the post-office, visited the defendant Ryan in January, 1913, and he told her his story about board of trade investments. She told him that she had $500 which she had saved for admission to an old folks' home, where they would take care of her when she could no longer work, and she could not afford to lose it. She gave him a manuscript of a book written by her husband concerning the inhabitants of the other world, which he agreed to have published, and he told her that he had communication with the spirit of her departed husband and he would invest the $500 for her so as to make large earnings. She gave him the $500, which he appropriated to himself. Mrs. Thomas, in the latter part of October, 1912, went to the defendant Ryan for a reading, and he had her write questions which he answered and asked her if she had any money. He said he would make her successful and act like a brother to her, which she thought would be fine,

and so she gave him $500, and he afterward told her that the interest was $130, but as she didn't need it she left it with him and drew $370 from the bank to make it $500. She gave him in all $1000 and never got any returns. Mary E. Rapp, a widow, visited the rooms at 1316 Michigan avenue and wrote questions on a piece of paper. Frank Ryan told her there was an evil influence giving her troubles and losses and charged her $25 to remove the evil influence. He found that she had money and proposed investments, and she gave him a draft for $1000, which was cashed in the presence of Bertsche by the defendant James Ryan. She later gave Frank Ryan more money, and finally sold her farm and gave him a draft for $7500 to be invested. He gave her at different times $90, $110 and $225 as earnings on her money but she was swindled out of the rest. Nellie Rosenquist about February 1, 1913, gave Frank Ryan $1000 which he said he wanted to put some good luck into, and that was the last she saw of him. Carrie Vanderberg, a clerk in a baker shop, visited the defendant in January, 1913, and he told her to concentrate every night at a certain hour so he could get more into her head. She gave him $310.50 to invest in stocks and never got any stocks and was cheated out of it. Bert Pyle visited the defendant Ryan at 1316 Michigan avenue and gave him $400 and afterward gave $200 to Frank Ryan. An investment was to be made in stocks but Pyle received no stocks, and when he went back in February, 1913, he found no one but a negro, and it was claimed that the money had been invested in a mine in Mexico. John Weick, a laborer, went to the place at 1316 Michigan avenue and gave one dollar for a reading. He wrote questions, and the professor put the paper to his head and taking Weick by the hand said he would help him out. Weick was out $25 for that service, and also handed over $306 to be invested in a mine in Colorado.

Bertsche was at 1316 Michigan avenue when Mrs. Rapp was there, and he took her card out of the case and gave it to Milton. He was in the habit of looking after the card case and index box and standing outside of the door when persons were having their fortunes told, saying that it made him laugh to hear the fools talk. Bertsche paid rent for rooms which he sub-rented to fortune tellers, and when James Ryan proposed coming to Chicago, in August, 1912, Bertsche and Frank Ryan discussed the advisability of permitting James to operate. Russell paid Bertsche $300 the first month, $350 the next and $400 the next and ten per cent of the profits, and his predecessor, Ross, had paid the same amounts. James and Frank Ryan were very frequently at Bertsche's place, and Bertsche often inquired of the doorman as to the number of people who had called, and if any of the suckers were coming back, and if any officers came. At the last Bertsche said that it didn't look as though he would be able to keep the place open more than a couple of days; that Jimmy's big "38" would soon be put over and they would close the "store." Mrs. McEldowney lost her draft on March 3, and as soon as it was collected the business was closed, so that undoubtedly the big "38" meant her. Bertsche cashed the first draft of $400 which Mrs. McEldowney gave the defendant Ryan, at a north side bank in Chicago, and it had upon it a prior endorsement, which Bertsche on the trial admitted was fictitious. On the same day that the draft for $12,500 was obtained Bertsche opened an account with a bank where he caused himself to be introduced under the fictitious name of B. P. Christy, and he gave a false address as his residence. He deposited the draft for collection, and within three days, as soon as the draft was collected, he withdrew the money, closed the account and went to Kansas City with the Ryans. The evidence left no doubt as to the guilt of both defendants.

It is argued that the confidence game statute is void because uncertain, but the contrary has been repeatedly held ever since the enactment of the statute.   No more certain definition could be given than that method of swindling called the confidence game.   The means that may be used are different and varied, but that fact no more renders the statute uncertain than the different means employed to gain entrance to a building make burglary uncertain or the various means by which death may be caused render the crime of murder uncertain.   *Morton* v. *People,* 47 Ill. 468; *Maxwell* v. *People,* 158 id. 248; *Graham* v. *People,* 181 id. 477; *People* v. *Clark,* 256 id. 14; *DuBois* v. *People, supra.*

We do not understand what possible connection the fourteenth amendment to the Federal constitution has with this case or the power of the State to define and punish crime.

One error assigned is that two separate and distinct offenses were charged in the first count of the indictment and therefore the motion to quash the indictment should have been sustained, and under the same head in the argument it is said that there is a fatal variance in the record.   The count referred to by counsel, and under which the defendants were convicted, charged but one offense, consisting of a single transaction at a certain date.   When different offenses were proved at different dates the defendants might have asked the court to require the prosecution to elect upon which it would rely, but that was not done.   The evidence showing distinct transactions did not create a variance, since the date alleged was immaterial.

It is urged that no crime was proved because the drafts were not property.   It would make no difference if that were so, for the reason that the defendants obtained $100 in cash.   The drafts, however, were property.   They were domestic bills of exchange drawn by one bank upon another and were in the hands of the payee.   A check in the

hands of the maker is not property, because delivery is an essential part of the complete execution of the instrument, (*Lory* v. *People,* 229 Ill. 268; *People* v. *Warfield,* 261 id. 293; 3 Ruling Case Law, 859;) but a delivered check or draft is property. *Goldgart* v. *People,* 106 Ill. 25.

The evidence shows that the defendants took advantage of the confidence reposed in the defendant Ryan by Mrs. McEldowney and thereby defrauded her of her property by a swindling scheme, and it is immaterial that the scheme took the form of a business transaction. (*Hughes* v. *People,* 223 Ill. 417; *Chilson* v. *People,* 224 id. 535; *People* v. *Depew,* 237 id. 574; *People* v. *Poindexter,* 243 id. 68.) The notes were not given with any intention or expectation of either party that they were to be paid, and the note for the $12,500 draft was given, according to Ryan's testimony, so that Mrs. McEldowney could show it to her son.

It is also contended that a material element of the crime is the use of false or bogus checks, or other means, instrument or device, aside from false verbal representations, and that none was proved. The false and verbal representations, pretensions and statements in this case were supplemented by tricks and deception which led Mrs. McEldowney to believe that Ryan had supernatural powers, but no physical means of deception are necessary. The Supreme Court of Colorado has held that to constitute the offense of obtaining money by the confidence game the money or property must be obtained by some false or bogus means, instrument, symbol or device, as distinguished from mere words, however false or fraudulent; (*Wheeler* v. *People,* 49 Colo. 402;) but, as stated in the annotation of that case in Annotated Cases, 1912*a,* that doctrine has not been announced in any other reported case, and it is directly contrary to numerous decisions of this court, which are given above. The decision in *Wheeler* v. *People* is not the law in this jurisdiction.

The judgment is affirmed.      *Judgment affirmed.*