STEPHEN G. CHILSON

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed December 22, 1906.*

1. CONFIDENCE GAME—*an apparently legal contract may be part of a confidence game.* The fact that a contract entered into by one party with no intention of carrying it out but for the purpose of inducing the other to part with his money without adequate consideration is apparently an ordinary partnership agreement to carry on a legitimate business venture does not prevent prosecution of the wrongdoer for the "confidence game," upon the ground that he has simply been guilty of a breach of contract.

2. SAME—*when omission from instruction of words used in statute defining confidence game is harmless.* An instruction for the People, in a prosecution for the confidence game, which advises the jury that "every person who shall obtain money from any other person" by the confidence game shall be imprisoned in the penitentiary, etc., is not harmful to the defendant because it fails to also include persons who "attempt to obtain" money by the confidence game, as is provided in the statute.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. GEORGE A. DUPUY, Judge, presiding.

WILLIAM A. JENNINGS, and FRANK H. BOWEN, for plaintiff in error.

W. H. STEAD, Attorney General, and JOHN J. HEALY, State's Attorney, (FLETCHER DOBYNS, of counsel,) for the People.

Mr. CHIEF JUSTICE SCOTT delivered the opinion of the court:

Stephen G. Chilson, plaintiff in error, was indicted by the grand jury of Cook county, at the February term, 1906, of the criminal court, for the crime of obtaining money by means of the confidence game. Upon trial at the May term of the criminal court he was convicted, and after the court

had overruled a motion for a new trial and a motion in arrest of judgment he was sentenced to the penitentiary at Joliet. He prosecutes this writ.

Chilson, according to his evidence, was employed by E. R. Marden, who was connected with the Deer Park Improvement Association as manager, Deer Park being represented as a summer resort in Luce county, Michigan, on the southern shore of Lake Superior. Chilson states that he had been disposing of lots located in Deer Park through arrangements with men engaged in the grocery business, whereby the grocer would give away every third lot to a customer upon the purchase of a specified amount of groceries, and Chilson would then go to those so receiving lots and sell them adjoining lots when he could do so. Chilson advertised in the *Chicago Tribune* for a partner with $300, to go into the real estate business in Milwaukee. Spooner, a physician residing at Nappanee, Indiana, answered this advertisement by mail, and received a postal card from the plaintiff in error asking him to come to Chicago and he would make him an offer. About January 10, 1903, Spooner went to Chicago to the address given him, which proved to be Marden's office, and there he met Chilson, who explained to him the proposition, which contemplated the formation of a partnership to sell in the city of Milwaukee, Wisconsin, lots located in Deer Park by arrangement similar to that which Chilson alleged had been followed in Chicago. The two partners were each to invest $300, and were to purchase six hundred lots, at one dollar each, from the Deer Park Improvement Association. Chilson explained that it was necessary to have two men interested in the business,—one to keep an office, and the other to call on grocers and to call on those to whom lots had been given, for the purpose of selling them lots adjoining those received by gift. The price of those sold was to be $25 each. Chilson proposed that he would do the outside work and Spooner should keep the office. Chilson and Marden made glowing representations

as to the amount of business Chilson had done in Chicago and as to the possibilities of Deer Park as a summer resort, and Marden highly extolled Chilson's honesty and his ability as a salesman.

Spooner returned home to consider this proposition, and Chilson wrote him several letters urging him to go into the partnership, and as Spooner objected to putting in $300, Chilson finally agreed that the firm should start with two hundred lots, which would require each partner to invest $100 in the purchase of the realty, and Spooner wrote agreeing to engage in the business on this basis. Chilson also suggested, by letter, that he would go to Milwaukee and get the office started, Spooner to pay half the expenses, adding: "If you have confidence in me do this: kindly forward your half for the purchase of two hundred lots and have Marden forward abstract and deed to you."

Spooner returned to Chicago March 18, 1903, and met plaintiff in error at Marden's office. They agreed with Marden to buy one hundred lots each. Spooner paid $15 to bind the bargain, went home to prepare to go to Milwaukee, and on his return to Chicago paid to Marden the balance of the money due from him. An effort was then made to induce Spooner to join with Chilson in the purchase of four hundred additional lots, each to pay for the one-half thereof, and Marden offered to enter into an agreement to re-purchase all the lots which the firm should be unable to sell. Spooner gave as his reason for not investing more money, the fact that he had money tied up in oil stocks, and said that if he could dispose of this stock he would invest an additional $200 in the lots. Chilson told him he knew of a party who had money to invest, and later wrote a card to Spooner saying the party had agreed to invest the money "if we can agree to go to Milwaukee." Thereafter, at one of their interviews at Marden's office, an individual appeared on the scene and was introduced to Spooner as Joseph A. Berg, the party who would purchase oil stock. After some

conversation Berg agreed that he would take the oil stock on the succeeding Saturday at $500. Thereupon Chilson and Spooner purchased the additional four hundred lots, Spooner paying to Marden the further sum of $200. The latter caused a deed to be made to them for the lots, and gave them a contract, signed by himself, providing he would purchase from them, at the price they had paid, such of the lots as they were unable to dispose of "by their present plan or in case of sickness of either party." At the same time Chilson and Spooner signed articles of co-partnership providing for the prosecution of the firm business in Milwaukee. Failing to meet Berg in Marden's office to close up the oil stock trade, as he had expected, on the following Saturday, Spooner, after a conversation with Marden, went out to the Chicago stock yards to look for Berg. Chilson before this had told Spooner that Berg worked for a firm at the stock yards. Spooner put in a day searching for Mr. Berg but failed to find him, and has not yet been able to consummate the trade with him. Notwithstanding this disappointment, Spooner, pursuant to an arrangement with Chilson, went to Milwaukee, where Chilson was to meet him. Chilson failed to arrive, and first wrote that he had missed the boat on account of having gone to call on parties who wanted to buy lots. Later he wrote again that he had not started for Milwaukee as he had seen Berg, and that he was afraid that Spooner would be unable to close with Berg in Chilson's absence, and he had made an appointment for Spooner, Berg and himself to meet at Marden's office, and stating further that he was packing his furniture preparatory to going to Milwaukee. Spooner remained in Milwaukee about a week haunting the boat landing and the post-office seeking his partner or communication from him, and then returned to Chicago and attempted to get his money back from Marden. This he was unable to do and he searched in vain for Chilson. Finally, after much correspondence and many promises, Marden took up the deed to the firm, and in set-

tlement of Spooner's demands caused a deed to be made to him individually for three hundred lots in Deer Park. Upon the trial Chilson testified that he was unable to go to Milwaukee on account of the serious illness of his wife.

The principal contention here is, that the facts which the evidence for the prosecution tends to establish do not constitute the offense denounced by the statute.

We think it clear that Chilson obtained the confidence of Spooner by representing that he would engage in the contemplated business with Spooner, as his partner, in Milwaukee, and by reason of the confidence so inspired induced Spooner to pay the money to Marden. It is also evident that Chilson did not intend to engage in the business in Milwaukee, and that he falsely pretended he would do so for the purpose of leading Spooner to pay his money for the lots, which seem to have been of little or no value.

Chilson says he has been convicted merely "for a failure to carry out a plain civil contract or for a breach thereof," and that the distinction between the breach of a contract and the false and fraudulent scheme called the confidence game has been disregarded. If plaintiff in error had entered into the contract in good faith his reasoning would be conclusive. Where a contract apparently legal is entered into by one party with the intention of taking no step to carry it out, but with the wrongful intent of causing the other to part with his money without receiving any adequate consideration therefor, such contract may, and in this case did, become a mere incident of the "false and fraudulent scheme." The ordinary case of agreeing to sell the gullible one a gold brick now in the possession of the aged Indian presents a breach of a contract, and yet counsel would scarcely pretend that it is for that reason any the less a confidence game. The fact that the affair was made to assume the guise of an ordinary business transaction, whereby, as a preliminary, Spooner was required to pay his money for the lots, is without significance. It is the substance, and not the form, that is material.

The transaction in question was "a swindling operation, in which advantage was taken of the confidence reposed by the prosecuting witness in the plaintiff in error,"—a confidence that had been obtained by deceit and false promises. The case came within the confidence game statute. *Maxwell* v. *People*, 158 Ill. 248; *DuBois* v. *People*, 200 id. 157; *Hughes* v. *People*, 223 id. 417.

Secondary evidence of the language of the advertisement in the *Chicago Tribune*, which came to the attention of Spooner, was admitted. It is urged that the necessary preliminary proof of the loss or destruction of the original was not made. We think the preliminary proof was in substantial compliance with the law; but it was conceded by Chilson, on cross-examination, that it was in response to his advertisement that Spooner first communicated with him, and as that was the only material thing in regard to the advertisement, proof of its contents was not harmful.

The fifth instruction given the jury at the request of the People advised the jury "that every person who shall obtain from any other person" any money, etc., by the confidence game, shall be imprisoned in the penitentiary, etc. It is said this instruction is fatally defective because the words "shall obtain" are not followed by the words "or attempt to obtain," as in the statute, and we are referred in this connection to the case of *Hix* v. *People*, 157 Ill. 382. That authority does not touch the question at all. The effect of the omission of the words was to narrow the statute in its application to the case on trial, which would seem to have been to the advantage of Chilson.

After the judge of the criminal court had read the instructions to the jury, and before the jury had retired, the assistant State's attorney called his attention to a palpable mistake occurring in each of three of those which had been read at Chilson's request. The judge thereupon stated to the jury that he would withdraw those instructions, and they were detached from the other instructions and the latter

were then sent with the jury to the jury room. This procedure is questioned, but we are not advised in what way plaintiff in error was prejudiced and we do not think he has just cause for exception. Other objections to the action of the court in passing on instructions are equally without merit.

Several questions are raised which have heretofore by this court been determined adversely to the contentions of plaintiff in error. The earlier cases are not adverted to in his brief and argument, and no reason is suggested by counsel for re-examining those questions, and as no such reason occurs to us we will not again discuss them at this time.

Finding the record free from reversible error we will affirm the judgment of the criminal court.

*Judgment affirmed.*