THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* THOMAS P. KEYES, Plaintiff in Error.

*Opinion filed June 24, 1915—Rehearing denied October 7, 1915.*

1. CRIMINAL LAW—*what is a confidence game and not merely a breach of contract.* One who advertises for a partner in the moving picture business, obtains the confidence and money of his victim by contracting to sell him an interest in a moving picture theatre and thereafter refuses to carry out his agreement or return the money is guilty of obtaining money by means of the confidence game and not merely of a breach of contract, where the evidence shows that he did not enter into the contract in good faith, with the intention of keeping it, but merely to obtain the money of his victim and thereby defraud him.

2. SAME—*what evidence admissible to show guilty knowledge.* In a prosecution for the confidence game, where the accused advertised for a partner in the moving picture business and obtained the confidence and money of the prosecuting witness by entering into a contract purporting to sell an interest in a moving picture theatre, proof that after such transaction the accused advertised three times for partners and each time made a similar contract with different persons for the sale of an interest in different moving picture theatres, failing each time to carry out his contract or return the money, is admissible as tending to show guilty knowledge and to disprove good faith.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. THEODORE BRENTANO, Judge, presiding.

STEDMAN & SOELKE, for plaintiff in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, and C. H. LINSCOTT, for the People.

Mr. JUSTICE COOKE delivered the opinion of the court:

Plaintiff in error, Thomas P. Keyes, was indicted in the criminal court of Cook county for obtaining the money of Rudolph Reiger by means and use of the confidence game. He was found guilty in manner and form as charged in the indictment and sentenced to the penitentiary under the Indeterminate Sentence act.

The evidence offered by the People tended to prove that Keyes advertised in one of the daily papers of the city of Chicago during the month of November, 1912, for a partner in the threatre business. Reiger answered the advertisement and met Keyes in his office, at 35 South Dearborn street, on November 26, 1912. Keyes offered Reiger a one-fourth interest in a theatre in Paw Paw, Michigan, which he then had leased for the period of one year from December 1, 1912, with an option of four years more. Reiger saw Keyes twice on that day. On the first visit Keyes referred him to a film company on Lake street to ascertain his responsibility. Reiger called there, returned to the office of Keyes, informed him that the reference was satisfactory, and the following contract was executed by the parties:

"*Know all men by these presents:* This agreement, made and entered into by and between Thomas P. Keyes, party of the first part, of Chicago, Illinois, and Rudolph Reiger, party of the second part, of the same place:

"*Witnesseth:* The party of the second part has this day and date paid to Thomas P. Keyes the sum of $400 (four hundred) and will pay the further sum of $100 (one hundred) out of his earnings of any theatre that he is connected with, with me, to be paid as follows: All over and above the sum of $15 (fifteen) a week to apply until the sum of $100 (one hundred) is paid, at which time the said Reiger has $500 (five hundred) interest in the theatre at Paw Paw, Michigan, which the said Keyes has leased, and known as the Longwell Opera House. Should the said Keyes desire to sell this lease and business at any time, the said Reiger is first to receive the amount of money that he has invested in said theatre, with at least 6% (six per cent) added, or one-fourth the profits on said investment. The said Reiger is to commence learning the business under the said Keyes' instructions here in Chicago, and as soon as he gets the run of the business he is to have charge of the theatre at Paw Paw, Michigan, and to receive a salary of $15 (fifteen) up to the first day of January, 1913. After that time he is to receive for his services the sum of $25 (twenty-five) a week out of the business first, before any division of the profits is made. After receiving his salary a division of the profits is to be made each month on the basis of one-fourth of the profits going to said Reiger and the balance to said Keyes. Mr. Reiger is to keep a true record of all of the money received in the man-

agement of said business, and also a book of expenses and receipts, of money paid out, and balance the same on the first day of each and every month.  Mr. Reiger is to have charge of the cashier and the general management of the theatre at Paw Paw, pay all bills and receive all money and hold the other employees responsible.

"After the first day of January, 1913, if Mr. Reiger is competent to handle a large theatre said Keyes reserves the right to transfer him to a larger house, and his interest to be on the same basis as at Paw Paw, Michigan.  Should the said Reiger and Keyes decide at any time to dissolve this partnership, the said Keyes reserves the right to pay Mr. Reiger his investment back with 6% (six per cent) added, or one-fourth of the profits, and take his interest off his hands, in the event of their not getting along satisfactory together, by giving sixty days' notice in advance.

"Mr. Reiger is to keep a bank account, deposit his money in a safe place and be responsible for all money received or expended, and to furnish Mr. Keyes, at his Chicago office, 35 South Dearborn street, a daily statement of the receipts and expenses.  Reiger is further secured by Keyes' note for $400 for sixty days.

"In witness whereof we have hereunto set our hands and seal this 26th day of November, A. D. 1912.  Executed and signed in duplicate.

THOMAS P. KEYES, (Seal)
RUDOLPH REIGER.    (Seal)"

Keyes gave Reiger a receipt for the $400 paid.  Reiger insisted that he also give him a judgment note, which he did, whereupon the provision, "Reiger is further secured by Keyes' note for $400 for sixty days," was inserted in the contract.  Reiger, who had been shown a lease on the Paw Paw theatre property, insisted upon having an investigation made of the title to the property and as to whether the lease had been executed by the owner.  Accordingly Morris Frisch, a clerk in a law office, was engaged to go to Paw Paw and make this investigation, his expenses being defrayed by Reiger and Keyes, jointly.  Frisch reported that the lease had been executed by the party having the title to the property, and Reiger was satisfied with the transaction.  Keyes paid but one month's rent on the Paw Paw lease and he never opened that theatre.  Although Reiger repeatedly requested Keyes to fulfill his part of the contract, teach him the theatre business and put him to work, his requests were never complied with.  Rei-

ger testified that on a few occasions Keyes allowed him to take tickets at the door of a theatre he operated in the city of Chicago, for half an hour to an hour at a time. Keyes testified that he offered to teach Reiger the theatre business and allowed him to take tickets for more than a week at a theatre he was operating.

Reiger, who was a native of Hungary and had been in the United States for seven years, was a man of scant education and a carpenter by trade. It appears that during the period of Reiger's dealings with him Keyes operated or had an interest in a moving picture show or show-house at 508 South Kedzie avenue, in one at 2648 North avenue and in one at 3255 Ogden avenue, in the city of Chicago, and in houses at Moline, Illinois, Racine, Wisconsin, and Paw Paw, Michigan. As has been noted, the house at Paw Paw was never opened or operated by Keyes. The house at 2648 North avenue, in the city of Chicago, was operated for four days, when Keyes sold his interest therein, and the house at 3255 Ogden avenue was never opened or operated by Keyes but his interest in the lease was sold while the place was closed. The lease of the theatre in Moline was secured in the fall of 1912. Keyes spent considerable time in furnishing and fitting up the house, and his lease was canceled on February 13, 1913. As to just what periods of time the houses at 508 South Kedzie avenue and at Racine, Wisconsin, were operated does not satisfactorily appear from the evidence. Reiger testified that the only work he was given to do by Keyes was in the line of his trade, in doing carpenter work in the various places where Keyes claimed to be interested, and in painting and helping generally to re-furnish and re-fit these places. He testified that Keyes paid him during this time between $60 and $70 and that no part of the $400 was ever returned. Keyes testified that for his services he paid Reiger $180, but admits that that was not in full for the labor he had performed. Reiger repeatedly requested him

to either fulfill his contract with him or return him his
money.   He informed him on various occasions that he
was out of funds and had no means to provide a livelihood
for himself.   On different occasions Keyes gave him small
sums, varying from twenty-five cents to a dollar, with
which to pay for his meals.   Finally Keyes ordered Rei-
ger out of his office and told him he would not have him
"sneaking" around there any longer.

The only contention made is that the facts proven do
not constitute the offense of procuring money by means
and use of the confidence game but show merely a breach
of contract.

For the purpose of showing the intent of plaintiff in
error and guilty knowledge on his part, it was proven that
in September, 1912, Owen B. Young, a bricklayer, who
resided in the city of Chicago, answered a similar adver-
tisement which he saw in the *Chicago Daily Tribune,* and
which was in substance:   "Wanted—Young man to take
part interest in a theatre; $600 required; quick action,"
and that Young entered into a written contract with Keyes,
whereby Keyes, for the sum of $600, sold him an interest
in the theatre at 3255 Ogden avenue, which the contract
recited Keyes was about to become the owner of.   This
contract is similar in terms to that entered into by Reiger,
and refers to the $600 which was paid by Young to Keyes
as a loan, as security for the performance of the covenants
entered into by Young.   Young's experience with Keyes
tallied almost exactly with that of Reiger.   Neither he nor
Reiger had ever had experience in the theatrical business
and each was to be taught the business by Keyes.   Young
also was referred to the film company on Lake street to
ascertain Keyes' responsibility.   His contract was dated
September 9, 1912, and provided that he was to be paid
$10 per week until October 15, 1912, and $25 per week
thereafter until otherwise agreed upon.   Keyes testified
that he paid Young $20 on this contract, but admits that

he thereafter borrowed $40 from him. Although he was often requested to do so, Keyes never made any pretense of keeping his contract with Young.

On February 26, 1913, Fred Turnbull, a waiter in a restaurant in Chicago, answered a similar advertisement in one of the daily papers of that city, and after making inquiries of the film company on Lake street at Keyes' request, entered into negotiations with Keyes, which resulted in Turnbull paying him the sum of $600 and entering into a written contract with Keyes on March 10, 1913, whereby Turnbull was sold a one-fourth interest in the theatre at 508 South Kedzie avenue, which the contract stated was then being re-furnished. In addition to the $600 so paid, the contract provided that Turnbull should pay the further sum of $200, at the rate of $50 per month, out of the earnings of his one-fourth interest. Turnbull was to act as assistant manager of this theatre under Keyes and be paid at the rate of $15 per week. In addition, his wife was to act as cashier for $5 per week, and his fifteen-year-old son as operator's assistant at $3 per week. These salaries were to commence as soon as the building was ready to open and the show started. Within a short time after this contract was executed, and before the building was ready to open, Turnbull having learned of Keyes' transactions with Reiger, Young and others, joined with them and one Samuels in procuring warrants for his arrest. Samuels did not testify, but it appears from the testimony of Keyes, and of others who overheard conversations between him and Samuels, that Samuels had entered into a similar arrangement whereby he paid Keyes $500 to become his partner in one of his theatrical enterprises, and had failed, as had the others, to secure a compliance with the contract entered into.

It is contended that an analysis of these three transactions will show that none of them amounted to a similar offense, and that therefore they have no bearing upon the

question and evidence concerning them was improperly admitted, and that the charge against Keyes must stand or fall on Reiger's testimony alone. This testimony was properly admitted and has a direct bearing upon the intent or guilty knowledge of Keyes when he made the promises he did to Reiger, entered into the contract with him and procured his money. While it is true that Keyes was actually engaged in the moving picture business and thus far had the means of carrying out the various contracts entered into, it is apparent that he never had any intention of complying with the contracts made. The record discloses that he was continually in need of money to carry on his various enterprises, and the money secured from Young and Reiger was spent in re-fitting the house in Moline. Although he had advertised for a partner in September, 1912, and had secured one in the person of Young, he was unable or unwilling to comply with the provisions of his contract. Yet in November he again advertised for a partner. Then, after he had secured another partner in the person of Reiger, although he was still unable to comply with the provisions of the contract made with either Young or Reiger and had secured their money and spent it, he was again advertising for a partner in February, 1913, and entered into contracts with both Turnbull and Samuels. It is apparent that he did not enter into these contracts with the intention of performing them but that he never intended to perform them and his only purpose was to secure the money of his victims, and then, when their importunities became tiresome to him, to tell them, as he did Reiger, to "go to hell and get out of here." There is no basis for the contention that this is a mere breach of an ordinary business contract honestly entered into. Keyes obtained the confidence of Reiger by representing that he would teach him the theatre business and give him a one-fourth interest in the theatre at Paw Paw, Michigan, or some other theatre which he controlled, and by reason of the

confidence so inspired persuaded him to pay him the sum of $400. It is evident that Keyes did not intend to keep the promises so made to Reiger, and that he falsely pretended that he would do so for the sole purpose of procuring $400 of his money. If he had entered into this contract in good faith, with the full intention of keeping it, his contention that this was merely a breach of an ordinary contract would be conclusive. But the evidence shows that he took advantage of the confidence reposed in him by Reiger and thereby defrauded him of his money by a swindling scheme, and it is immaterial that the scheme took the form of an ordinary business transaction. (*Chilson* v. *People,* 224 Ill. 535; *People* v. *Depew,* 237 id. 574; *People* v. *Poindexter,* 243 id. 68; *People* v. *Bertsche,* 265 id. 272.) As we said in *Chilson* v. *People, supra:* "Where a contract apparently legal is entered into by one party with the intention of taking no step to carry it out but with the wrongful intent of causing the other to part with his money without receiving any adequate consideration therefor, such contract may, and in this case did, become a mere incident of the 'false and fraudulent scheme.' The ordinary case of agreeing to sell the gullible one a gold brick now in the possession of the aged Indian presents a breach of a contract, and yet counsel would scarcely pretend that it is for that reason any the less a confidence game. The fact that the affair was made to assume the guise of an ordinary business transaction * * * is without significance. It is the substance, and not the form, that is material. The transaction in question was a 'swindling operation, in which advantage was taken of the confidence reposed by the prosecuting witness in the plaintiff in error,'—a confidence that had been obtained by deceit and false promises."

The judgment of the criminal court is affirmed.

*Judgment affirmed.*