(No. 11101.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES MARION MILLER *et al.* Plaintiffs in Error.

*Opinion filed April 19, 1917—Rehearing denied June 7, 1917.*

1. CRIMINAL LAW—*obtaining money through promises of marriage may constitute the confidence game.* A woman who enters into an agreement to marry without any intention of keeping her promise but does so for the unlawful purpose of gaining the man's confidence and obtaining his money and property, and thereby obtains from him his money and property, is guilty of the confidence game within the meaning of the statute.

2. SAME—*meaning of word "obtain," in the Confidence Game statute.* The word "obtain," in the Confidence Game statute, has the same meaning as it has in the False Pretense statute, and means to get hold of, to gain possession of or to acquire, and the offense consists of the getting hold of or gaining the possession of money or property by means of some trick or device or swindling operation in which advantage is taken of the confidence of the victim, even though the taking may also constitute larceny.

3. SAME—*offenses under Confidence Game and False Pretense statutes distinguished.* It is the means by which the property is obtained that distinguishes an offense under the Confidence Game statute from an offense under the False Pretense statute and not the character of the title or the benefit that is obtained by the swindler, as the title obtained in either case will not enable the swindler to hold the property as against the claim of the party swindled.

4. SAME—*a cashier's check is property within the meaning of the Confidence Game statute.* A cashier's check is a draft and is property within the meaning of the Confidence Game statute when delivered and put into circulation, as the word "property," in this statute, is used in its broadest and most significant sense, including any property other than money.

5. SAME—*obtaining money in any amount or value by means and by use of the confidence game is sufficient.* The obtaining of money in any amount or value by means and by use of the confi-

dence game will constitute the crime of the confidence game, and the word "money," in an indictment ·for such crime, imports value.

6. SAME—*what is a sufficient description of draft in indictment for the confidence game.* An indictment for the crime of the confidence game, charging the defendant with obtaining a certain draft, stating value, need not give a more definite description of the draft.

7. SAME—*objection to repugnancy in the allegations of an indictment must be taken by motion to quash.* No advantage can be taken for repugnancy in the allegations of an indictment except by motion to quash, as the charge of repugnancy goes merely to the form of the indictment.

8. SAME—*what evidence may be admitted in prosecution for the confidence game.* In a prosecution for the crime of the confidence game it is proper to admit in evidence all the gifts from the victim to the swindler and the facts surrounding them, although some of them were given more than three years before the filing of the indictment, in order that the jury may understand fully the purpose of the gifts and the intentions of the swindler; and it is proper to show that all of the victim's property was obtained before the swindler abandoned her pretensions.

9. SAME—*what is not reversible error.* Error which does not materially affect the result of the trial is not reversible error.

10. SAME—*what statement in prosecuting attorney's argument does not refer to fact that defendant did not testify.* The State's attorney has a right to state in his argument that the defendants have made no denial of certain facts that were proved by the State and to argue to the jury the full force of the facts the State has proved; and such statement in the argument is not in violation of the statute prohibiting the prosecutor from making reference to or commenting on the fact that the defendants did not testify.

11. SAME—*prosecuting attorney should not refer to the poverty of the prosecuting witness in his argument.* In a prosecution for the crime of the confidence game the State's attorney should not refer, in his argument, to the poverty of the prosecuting witness, the victim of the swindle, where such reference can serve no other purpose except to arouse the sympathy of the jury.

12. WORDS AND PHRASES—*word "property" includes commercial paper.* The word "property," as commonly used and understood in the commercial world and as defined by lexicographers, includes checks, drafts and all commercial paper.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOSEPH H. FITCH, Judge, presiding.

WILLIAM S. FORREST, DANIEL DONAHOE, and LEO L. DONAHOE, for plaintiffs in error.

P. J. LUCEY, Attorney General, MACLAY HOYNE, State's Attorney, C. H. LINSCOTT, and FRANK JOHNSTON, JR., (EDWARD E. WILSON, and GEORGE C. BLISS, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

An indictment containing four counts was returned by the grand jury of Cook county at the June term, 1910, of the criminal court of said county, against J. Marion Miller and Lodavine Miller, plaintiffs in error. The trial resulted in a verdict of guilty by the jury on the fourth count, the court having previously quashed the first three counts of the indictment. Motions for new trial and in arrest of judgment were overruled on September 12, 1916, and plaintiffs in error were adjudged guilty and sentenced by the court to serve an indefinite term in the penitentiary at Joliet.

The fourth count of the indictment charges plaintiffs in error with obtaining from Thomas Foulkes, by means and by use of the confidence game, the following things: "A large amount of money, goods and personal property, to-wit: One thousand seven hundred and fifty dollars, lawful money of the United States of America; one draft, the same being an instrument of writing, a more particular description of which said draft is to the said jurors unknown, of the value of one thousand seven hundred and fifty dollars; and one draft, the same being an instrument of writing of the value of one thousand seven hundred and fifty dollars; the goods, money and personal property of said Thomas Foulkes."

Plaintiff in error J. Marion Miller, hereinafter referred to as J. Marion, is an attorney at law and has his office in the city of Chicago. The other plaintiff in error, Lodavine Miller, hereafter referred to as Lodavine, is a sister

of J. Marion and resided in the city of Chicago. In 1901 Thomas Foulkes was, and had been since 1876, living on a farm near Danbury, Iowa, and was engaged in farming. In that year he went to Chicago with some stock and had a conversation with Dr. Francis M. Stewart, who asked Foulkes to write to Lodavine. Foulkes went home and wrote a letter to Lodavine, never up to that time having seen her or been introduced to her. She replied to his letter and sent him her photograph, and they continued their correspondence until about September, 1902, when he went to Chicago to see her. He called on her at her residence, 486 Fullerton avenue. In their conversation she told him that she was thinking of going away, and if she didn't go away she wanted to go down and meet him the next day at his stopping place, the Chicago Hotel. She did meet him there the next day. They had supper together that evening and went to a theater. On returning home Foulkes wrote to her and asked her to marry him. She replied promptly (October, 1902,) and accepted his proposal of marriage. In answering his next letter she wrote him that she would be very happy to have a diamond ring and asked him for $300 with which to buy it. He replied that he could not give her $300 to buy a ring but enclosed in his letter $100 for that purpose. Very shortly thereafter she wrote him that she had a suit pending against the Chicago Union Traction Company and asked him for $200 to pay expenses. He immediately sent her $200 in a letter, in which he asked her when they were going to get married. She replied that she couldn't get married until her suit was over with said company. Shortly following this letter she wrote and obtained from him further sums of $300 and $500, respectively, to pay the expenses of said suit, and in the letter in which she wrote for the $500 she told him that she had to get a great many witnesses from Iowa at considerable expense, and that she would never ask him for any more money if he would send her that amount. He mailed her

the two last named amounts, and in May, 1903, she wrote for $800 "to carry her through for another year." He did not answer that letter or write her further until late in 1903. In October, 1903, she paid him an unsolicited visit, at which time she asked him to write her again. She took dinner with him at his home and in the evening he took her to the Danbury depot in his buggy. On the way to the depot she said to him, "Tommy, I love you dearly; you have made me some trouble; now I would like to have you give me some money to go back." He told her he had $65 in his pocket and gave it to her, but he failed to write to her. She visited him at his home again in November, 1903. At the conclusion of her visit, at her request, he took her to Battle Creek, Iowa, and on their way there she kissed him and told him "how dearly she loved him," and again asked him to write to her. He told her he would. She then asked him for some money. He borrowed $20 at the lumber yard and gave it to her. They had supper together at the hotel, after which she took the train to Chicago and he drove back to Danbury. The correspondence between them went along smoothly after this visit until about April, 1910. He became desperately in love with her, and by protestations of love and repeated assurances that she would marry him when her lawsuit was over she gained his full confidence and implicit faith in her sincerity. She continued her well-designed and systematic plan of obtaining his money and property. Every purpose for which she asked money of him was in some way made to appear feasible and that it was solicited for the common benefit of both and in view of their eventual marriage. She obtained from him more than $10,000 of his money and property and left him practically penniless. The following tabulation shows the various amounts of money she obtained from him and the pretended purposes for which she solicited it, together with the dates she received it, to-wit:

| | | |
|---|---|---:|
| Nov. | 1902, for her wedding ring | $100.00 |
| Same | 1902, expenses for her traction suit | 200.00 |
| Jan. | 1903, same purpose | 300.00 |
| Mar. | 1903, same purpose | 500.00 |
| Oct. | 1903, expenses from his to her home | 65.00 |
| Nov. | 1903, same, expenses home | 20.00 |
| Apr. | 1905, to run rooming house in Oregon | 800.00 |
| Aug. | 1905, expenses to locate in California | 350.00 |
| Nov. | 1905, to buy chicken ranch in California | 350.00 |
| Dec. | 1905, additional for chicken ranch | 50.00 |
| May | 1906, to buy lots in California for their home | 1200.00 |
| Aug. | 1906, for furniture for their intended home | 550.00 |
| Sept. | 1906, to buy and move house on lots in California | 400.00 |
| July | 1907, for another home at Long Beach, California | 3047.96 |
| May | 1908, expenses to Chicago about her suit | 5.00 |
| July | 1908, for support and maintenance | 50.00 |
| Aug. | 1908, ″ ″ ″ ″ | 50.00 |
| Sept. | 1908, ″ ″ ″ ″ | 50.00 |
| Oct. | 1908, ″ ″ ″ ″ | 50.00 |
| Nov. | 1908, ″ ″ ″ ″ | 50.00 |
| Dec. | 1908, ″ ″ ″ ″ | 50.00 |
| Jan. | 1910, their expenses to Honolulu to get married | 1750.00 |

In 1905 Lodavine informed Foulkes that she was tired of Chicago and wanted to locate in California. She had repeatedly assured him that they would get married when her said suit was over. Before going to California she asked him to see her brother, J. Marion, at his office, and to tell him they were going to get married and to ask him what he thought about it. He did as requested, and J. Marion said to him that their proposed marriage was all right with him. After she got to California she continued writing to Foulkes, who had remained at Danbury on his farm. She wrote him glowing descriptions of the country and asked him to come out there to live. In June, 1907, he sold his farm and went to California, arriving there in July, 1907, with two drafts,—one for $2547.96 and the other for $500,—which was about all the money he had left. She met him at the station in Los Angeles and took him to a rooming house where she had secured a room for him. A few days later she informed him that she had traded the two lots she had bought in Glendale, California, for eighty

acres of mahogany timber land in New Mexico, and asked him for said drafts to purchase another nice little house in Latin, California, at the Long Beach line. He indorsed and delivered to her the drafts and she bought the property, consisting of five lots and a house, and took the title in both their names. He went to the property and lived there until the fall of 1909. She continued to live in Los Angeles until May, 1908, when she went to Chicago, presumably to close up her legal matters. During her stay in California she visited him at their house in Latin and they would have dinners and suppers there together. Every time she visited him there she would kiss him and pat him on the hand and tell him "how dearly she loved him," and that she wished her suit was over so they could get married. Shortly before she left for Chicago, in May, 1908, she told him that her uncle had died in Honolulu, leaving her $25,000 or $30,000 worth of property, and asked him to borrow $2000 from his brother to pay their expenses so they could get married and go to Honolulu. He made an effort to borrow the money but it appears that he failed to get it. After she got to Chicago she wrote him, advising him to sell the Latin property and that she would send a deed to it if he could sell it. He returned to Chicago in 1909 on her information to him that a certain attachment suit which Dr. Stewart was prosecuting against a certain farm of Foulkes' in Minnesota was coming up for trial. Foulkes had previously paid J. Marion $100 to attend to this suit, after J. Marion had written him, while he was on his farm at Danbury, that the suit had been instituted. The record does not show that any such a suit was tried or what became of it. Shortly after Foulkes arrived in Chicago both Lodavine and J. Marion informed him that Lodavine's suit with the traction company had been settled for $2700.

Foulkes, while in Chicago, received his mail at J. Marion's office. He showed J. Marion a letter he had received from one McConnell, of Kansas City, offering $1700 for

the Latin property. Foulkes wanted $1800 for it. J. Marion advised him to split the difference with McConnell and make the sale so that Foulkes and Lodavine could go to Honolulu. Foulkes agreed to it, and J. Marion then negotiated the sale for him of that property and received from McConnell a $1750 cashier's check drawn on the Westport Avenue Bank of Kansas City, Missouri, by its cashier, January 13, 1910, payable to the order of J. Marion Miller. J. Marion indorsed the check in blank to Foulkes. The next day, while they were in J. Marion's office, Lodavine asked Foulkes to give the draft to her. She said she would keep it for him until they got ready to go to Honolulu; that she was afraid he would lose it; and he accordingly delivered it to her then and there. She later indorsed the check in blank and got credit for it in the American Trust and Savings Bank of Chicago. That check was later indorsed by the American Trust and Savings Bank of Chicago, the Continental National Bank of Chicago and the Inter-State National Bank of Kansas City, and the check bears on its face a circular stamp-mark reading, "Westport Avenue Bank, Kansas City, Missouri," and across the center of the stamp-mark, "Paid Jan. 20, 1910," is written. A few days later Lodavine went with Foulkes down to the room at Mrs. Possegger's, on Center street, Chicago, which she had rented for him previous to his return from California. She told him she wanted to fix up his trunk so that they could get ready to go to Honolulu, and that there were some things in his trunk that he would not want. She took out a large amount of letters and told him to put them in the stove and burn them. He did as she directed. In that package of letters were all the letters that she had written him that he had at that time in his possession, except a few that happened to be in his valise. She had previously, on her first visit to him at his home in Danbury, taken possession of all the letters in his possession that she had written to him up to that time. In April, 1905, she got possession of

278 – 32

a package of letters that had been written to him by her after her said first visit to him. She and her counsel at the trial of this case declined, on notice, to produce any of her letters written to him or any of his letters written to her or to state where they were.

On February 1, 1910, Lodavine told Foulkes that Miss Ellen Roberts, an attorney at law in Chicago, had sued him and her for $50,000 and that they would have to stay in Chicago to appear at the trial, and that she could not go to Honolulu after getting the "subpœna." J. Marion also spoke to him about the Ellen Roberts suit shortly thereafter, and told him that the sheriff had been at his office with a "subpœna" for Foulkes, and that he and Lodavine would have to stay in Chicago and appear in the suit and could not go to Honolulu until it was over. J. Marion showed him the "subpœna" but did not give it to him, and said he told the sheriff that it was not necessary for him to come there and serve it on Foulkes and that he would give it to Foulkes when he came. Foulkes was never served with process or notified of any such suit thereafter.

In February, 1910, while Foulkes was waiting in Chicago to appear in the suit of Ellen Roberts that never thereafter came up, without means to stay or to get away from Chicago, Lodavine at her house told him that if he didn't want to stay there he could go to Los Angeles, and to go ask J. Marion if Foulkes could depend upon getting $50 a month out of his Paulina street property. J. Marion had that property, which belonged to Foulkes, for the purpose of renting it for him. J. Marion told him that he could depend upon getting $50 a month out of the rent of that property; that he was entitled to it; that there was one flat not rented, and that after it was rented he might get more. Foulkes had previously deeded that property to Lodavine, at her request, to get the money to go to Honolulu. She was unable to borrow any money on it, and the record does not show whether she deeded it back to Foulkes or not.

About March 1, 1910, Foulkes started back to Los Angeles, California. Lodavine went to the railway station with him and gave him a bible. Her parting injunction to him was to join the church when he arrived at Los Angeles, as that would put him in the hands of good people; that if he got a chance to marry a rich widow he should do so; that she (Lodavine) could be a better mother to him than a wife, and not to marry anyone until he had consulted her. After he got to California she wrote him a few letters and he wrote her a few, in the last of which he asked her for $300 to pay a man out there whom he owed. She answered the letter but sent him no money. He never heard from her again.

While Foulkes was in California in the spring of 1908, J. Marion wrote him that he had rented for him his Paulina street property in Chicago at $50 per month, and sent him $50 for the first month's rent collected in June of that year. When Lodavine left California, in May, 1908, she told Foulkes she had no money and that her attorneys would have to send her a ticket to go to Chicago. He had only $15 in money at that time and gave her $5 of it. She asked him to write J. Marion to pay her the rent money on the Paulina street property when she got to Chicago. He wrote J. Marion that Lodavine said she had no money and asked him to pay the rent money direct to her. She told Foulkes, when he got to Chicago, that she got the rent money, and had him give her receipts, made to her brother, J. Marion, for the money so collected by her while Foulkes was in California. Six of those receipts were given in evidence by plaintiffs in error. The above tabulation also indicates those six payments to Lodavine. While Foulkes was in Chicago J. Marion paid him $50 of that rent collected February 15, 1910, and he went to California on that money. Lodavine paid for a suit of clothes he bought at the Fair just before he left, and that suit of clothes and the bible were the only property or money that he ever got back from her out of

all the money she obtained from him. After he got to California J. Marion sent him $50 a month for the months of March, April and May, 1910, the rent collected on his property for those months, and that ended the transactions of Foulkes with plaintiffs in error.

The evidence in the record clearly proves that Lodavine entered into the marriage contract with Foulkes without any intention of keeping that promise, but did it for the unlawful purpose of gaining his confidence, so that she might obtain from him his money and property, as contended by the State. Her unlawful conduct was clearly a confidence game within the meaning of the statute, and she was proven guilty, beyond all reasonable doubt, of obtaining by means and by use of the confidence game the money and property of Foulkes, as charged in the indictment. The evidence also conclusively shows that J. Marion was cognizant of her unlawful conduct, and that he aided and assisted her in the commission of her crime and is therefore guilty as an accessory before the fact. The contention cannot be maintained that Lodavine was merely guilty of the breach of a marriage contract. Her breach of that contract was a mere incident of her false and fraudulent scheme to obtain from Foulkes his money. She entered into the contract and made her declarations of love and affection and repeated vows that she would keep her promise for the unlawful purpose of obtaining his confidence and his money, and for that purpose, only. The transaction was clearly a "swindling operation," in which she took advantage of the confidence reposed in her by Foulkes,—a confidence which she had obtained by deceit and false promises as aforesaid. The case comes clearly within the Confidence Game statute. *Chilson* v. *People,* 224 Ill. 535; *People* v. *Weil,* 243 id. 208.

The facts already recited were practically undisputed by plaintiffs in error. Neither of them testified on the trial. The only evidence offered by them was thirty-four exhibits, consisting, among others, of eleven receipts and checks for

$50 each, and were given for the rent of the Paulina street property, as already explained; also two receipts, dated July 20, 1904, and April 8, 1908, respectively, for $1140.37 and $800, both of which were made to Lodavine. The former recites that it is in full of all notes and interest and all demands on her; the latter, that it is in full of the amount she owed him. Both purport to be written at Danbury, Iowa, and signed by Foulkes. Foulkes testified positively that he never wrote or signed either of those receipts, and never received the money, or any part thereof, mentioned therein. No one contradicted Foulkes' testimony except an expert witness on handwriting,—the only witness who testified for plaintiffs in error,—who merely testified that it was his opinion that the same party signed those receipts who signed other exhibits in the case admitted to be in Foulkes' handwriting. The other twenty-one exhibits consisted of eighteen letters and five envelopes, each of two of the envelopes being joined with a letter, the four being introduced as two exhibits. The five envelopes were admitted by Foulkes to be part of the envelopes addressed by him to Lodavine at Danbury, each containing one of the letters written by him to her. Foulkes also admitted that thirteen of the letters made exhibits were written by him and signed by him. He further testified, however, in rebuttal, that those thirteen letters were written by him in J. Marion's office in the fall of 1905, and that all of them were dictated to him by Lodavine in said office while J. Marion was "outside of the door" of the office; that Lodavine there told him that the Chicago Union Traction Company's attorneys served notice on her attorney to produce all correspondence between her and Foulkes; that the company wanted to show that they were to be married, and that if she was able to be married "she was not hurt so bad she needed damages;" that she said, "I am going to fool 'em a trip," and asked him to be at the trial when it came up and identify the letters so written by him. She also told him that she had the

letters originally written by him of the dates given the letters then dictated to him. Those letters purported to be all written from Danbury, Iowa, and bore dates prior to the date they were dictated, and every word in them was dictated to Foulkes by her and written by him just as she dictated them. These letters were by no means sentimental or in any sense love letters. They were designed, evidently, as evidence to establish thereafter those very facts, as well as the further fact that Foulkes had loaned her the money that she had gotten from him at an usurious rate of interest, and contrary to the real facts in the case. The following exact copies of four of those letters are here appended, to-wit:

"December 8th, 1901, Danbury, Iowa. Miss Lodavine Miller. Dear Madam: I heard from your Uncle William that you had been hurt in a street car wreck and the girls wanted me to write to find out. Agnes is coming to Chicago and will stop to see you, she is on her way to Ohio. The weather is very cold and is very hard on stock. We lost 15 little pigs and some sheep. Resp., Thomas Foulkes."

"November 1, 1902, Lodavine Miller. Yes, I have some spare money and would like to loan it. I will charge you ten per cent for it, and would like for you take it for two years. yours truly, Thomas Foulkes, Danbury, Iowa."

"December 27, 1902, Lodavine Miller. We are —to hear that you are no better and I know it costs you so much. I would loan you a thousand dollars at ten per cent. with your note. You can give me three notes, one for $200, one for $300, and one for $500, and the interest won't be so hard you to pay. Do you think ten per cent is too high? Yours truly, Thomas Foulkes, Danbury, Iowa."

"July 26, 1904. Danbury, Iowa. Dear Madam: How are you feeling now? Do you still have those pains? You ought to go to the country. We have 20 little pigs. Received a draft from your father for the amount in full of money you borrowed of me. In — a receipt in full receipted by me. Kindly answer this. Thomas Foulkes."

Two others of those exhibits admitted by Foulkes to be in his handwriting were letters written by him to Lodavine in July, 1908, and April 16, 1910, respectively. Their contents bear no special significance in this case. The former

starts off, "Dear Loda," and closes with "best wishes, I am, yours," while in the latter he addresses her as "My dear Lodavine." The letters contain information about their intended home and the garden, and some rather enthusiastic remarks about meeting four old friends out there with whom he played marbles when a boy, etc. Considering the cool reception that he got from Lodavine when he left Chicago, the letter of April, 1910, is evidence that he was not so lacking in love and sentiment for her as he was in the other letters made to appear, which were dictated by her to him in 1905. Foulkes also admitted writing another one of said exhibits, a letter to J. Marion dated April 20, 1905, in which Foulkes enclosed him a draft for $100 to pay for legal services to be rendered by J. Marion in Foulkes' suit instituted by Dr. Stewart, and is in answer to one written to him by J. Marion about the same matter. He makes an uncomplimentary remark about Dr. Stewart, but the letter has no significance in this case except as otherwise explained in this opinion.

Another one of those exhibits which Foulkes admitted writing is dated October 10, 1903, and purports to be written at Danbury, Iowa, and is addressed to H. J. Walters. In the letter he seems to accuse Walters and one Leonard of having a package of papers which was taken out of Foulkes' pocket, and also connects Stewart's name with them, and charges them with being habitual robbers of farmers. He concludes with this sentence: "My attorney has the matter in charge and has lots of letters from farmers that you and Leonard and Stewart have robbed." We do not see any legitimate bearing that this letter can have upon the case. Besides, Foulkes positively testified that it was dictated to him by Lodavine at his home on her first visit there and that she dictated every word in it. He admits that there are some things in this letter that are untrue, and that there were also many things in the other letters that she dictated to him that were untrue, and that he

knew it when he wrote them. He gives as his explanation the fact that he was desperately in love with her and simply did as she suggested. The last exhibit is a letter purporting to be written by Foulkes on March 19, 1913, to J. W. Miller. The substance of the letter is that he has known Lodavine for eleven years and has never known her to be immoral and that she is an honorable and virtuous woman, whatever "Dr. Stewart, Ellen Roberts or anybody else says to the contrary." The letter further states that Dr. Stewart and Ellen Roberts induced him to have plaintiffs in error indicted, and all that he ever said about them was "a lie and perjury," and calls on his Maker to have mercy on his soul. Foulkes positively testified that he never wrote the letter or any part of it. He was only contradicted by the opinion of the expert in the manner already related.

The rebuttal testimony of Foulkes, with his counter-charges against Lodavine, if true, must be considered as very damaging testimony against her, and the introduction of the exhibits can only be looked upon as very damaging to plaintiffs in error's case if the jury believed, as they were warranted in believing, that his counter-charges were true.

It is contended by plaintiffs in error's counsel that there is no evidence in the record tending to prove that plaintiffs in error, or either of them, *obtained* the said cashier's check. This contention is based upon the assumption that "obtain," within the meaning of the Confidence Game statute, means to acquire title to,—not merely to acquire possession of,—money or property. It is true, as stated by counsel, that the evidence is that Lodavine asked Foulkes for the check and got possession of it with the declaration that she wanted to keep it for him until they went to Honolulu, because she was afraid he would lose it. It is also true that after she got possession of it she converted it to her own use, and never afterwards returned it or offered to return it, or any part of the proceeds thereof. The word "obtain," as used in this statute, has the same meaning as it has in the False

Pretense statute, as argued by counsel for plaintiffs in error. As used in both statutes the word "obtain" means to get hold of; to gain possession of or to acquire. Under the Confidence Game statute the offense consists of the getting hold of or gaining the possession of money or property by means of some trick or device or swindling operation in which advantage is taken of the confidence of the victim reposed in the swindler. (*Chilson* v. *People, supra.*) Under the False Pretense statute, whoever, with intent to cheat or defraud, shall designedly, by color of any false token in writing, or by any other false pretense, obtain from any person any money or personal property is guilty of obtaining money or property by false pretenses. Under a New York statute almost in the identical language as ours it was held that the word "obtain," in that statute, meant the same as the word "get" in its sense of acquire,—*i. e.,* the obtaining some benefit by the party getting the property or money. (6 Words and Phrases, 4894.) It is the means by which the property is obtained that distinguishes the two offenses, and not the character of the title or the benefit that is obtained by the swindler. A title is obtained in neither case that will enable the swindler to hold the property as against the claim of the party swindled. It makes it no less an offense under the Confidence Game statute that the character of the taking or of acquiring the property, or the intent with which it was obtained, may constitute larceny under the holding in the case of *People* v. *Johnson,* 113 Ill. 99, cited by counsel. It is sufficient that the evidence shows that Lodavine obtained the check by the use and by means of the confidence game.

A cashier's check is a draft. (*Culter* v. *Reynolds,* 64 Ill. 321.) It is property, within the meaning of the Confidence Game statute, when delivered and put into circulation. (*People* v. *Bertsche,* 265 Ill. 272.) The word "property," in this statute, is used in its broadest and most significant sense and is intended to include any property

other than money. The statute reads: "Every person who shall obtain, or attempt to obtain, from any other person or persons, any money or property, by means or by use of any false or bogus checks, or by any other means, instrument or device, commonly called the confidence game, shall be imprisoned," etc. The word "property," as commonly used and understood in the commercial world and as defined by lexicographers, includes checks and drafts and all commercial paper. That word, as interpreted under our Attachment and Revenue acts, has been held to include checks or drafts. There is nothing in the Confidence Game statute that in any way indicates that the word "property" is used in the restricted sense contended for by plaintiffs in error's counsel. We are not inclined to hold that the common law definition of property, as defined in connection with common law larceny, should be applied to this statute in the absence of an intent in the legislature to so restrict it. We consider that this question was practically settled in the case of *People* v. *Talmage,* 233 Ill. 560, where this court held an indictment good on motion to quash, in which the only charge was the obtaining of a certain draft, an instrument in writing, of the value of $500, etc.

The claim of plaintiffs in error that the evidence fails to prove that said cashier's check was of any value cannot be sustained. The evidence not only shows that Lodavine received credit for this check at the American Trust and Savings Bank but that said check was indorsed by the various parties above enumerated, and that it bore a stamp-mark on its face purporting to be the stamp of the Westport Avenue Bank, upon which the check was drawn by the cashier of that bank, and was marked paid. It is claimed by plaintiffs in error's counsel that the stamp of the Westport Avenue Bank was not put in evidence, as shown by the bill of exceptions, and that the only thing before this court in proof that said stamp was put in evidence is the check itself, as certified to this court by the trial court as original

· evidence under rule 12 of this court. It is true, as argued by plaintiffs in error, that the question whether or not that proof was made must be determined from the bill of exceptions and not from the certificate of the trial judge. There is a second bill of exceptions, however, in this record that was made in pursuance of a motion to correct the original bill of exceptions, which amended bill of exceptions was filed in this court on December 16, 1916. It is clearly shown from that amendment to the bill of exceptions that the purported stamp of payment and cancellation of the check was made as above recited. The trial judge in that amendment to the bill of exceptions expressly states that said stamp-mark was in evidence and repeatedly referred to and commented on before the jury by counsel. Besides, counsel for plaintiffs in error are not in a very good position to dispute the fact that Lodavine Miller received $1750 on that check. Her counsel, Mr. Steadman, in making an objection to the introduction of the draft as to J. Marion, used this language to the court, as shown by page 192 of the original bill of exceptions: "It [the check] is in evidence, marked paid to the order of defendant, identified and marked properly, and we will assume now that indicates she got $1750."

The contention of counsel that the check or draft was not proven to be the property of Foulkes is not sustained by the record. Foulkes testified that the draft was his. When it was indorsed by J. Marion in blank and delivered to Foulkes it was delivered to him as his property. It was recognized by Lodavine as his property at the time she obtained it from him, when she said that she would keep it for him. Although the deed to the Latin property was taken to both Foulkes and Lodavine, the money with which it was bought belonged to Foulkes. The obtaining by Lodavine from Foulkes of the money with which to buy the Latin property, the buying of the same, the selling of the same to McConnell, and the inducing of Foulkes by her to

sell the property and convert it into money, constitute one continuous transaction, which was schemed and planned by her for the purpose of obtaining for her exclusive use and benefit the drafts or money that Foulkes carried with him to California. It appears, as she viewed the matter, that it required that continuous transaction to consummate her ultimate design. The mere fact that the deed to the Latin property was made to both of them does not justify the claim that the draft that she finally obtained from Foulkes, or any part thereof, was her property and not the property of Foulkes. The foregoing questions, so far as she is concerned, do not stand in the way of her conviction if it were conceded that she was a part owner of the draft. All the transactions from July, 1907, by Lodavine with Foulkes are within the Statute of Limitations, and the evidence clearly shows that she received several sums of money from him, beginning with May, 1908, which were also obtained by means and by use of the confidence game. The obtaining of money in any amount or value by means and by use of the confidence game constitutes the crime charged in this indictment, and the word "money" itself imports value. (*People* v. *Clark*, 256 Ill. 14.) But the draft in question was proven to be the property of Foulkes. J. Marion recognized it as his property and delivered it to him. He aided and assisted Lodavine in the perpetration of her crime by advising Foulkes to sell the property so that he and Lodavine could go to Honolulu, and the circumstances clearly show that he knew that she did not intend to go to Honolulu or to marry Foulkes and that he was thoroughly cognizant of her unlawful purpose.

There was no motion made by the plaintiffs in error to quash the indictment. It was quashed as to the three counts at the instance of the People after all the evidence was introduced. Plaintiffs in error were charged with the obtaining of two drafts of the value of $1750. It was not necessary that the indictment should give a more definite

description of the drafts. (*People* v. *Brady*, 272 Ill. 401.) The allegation "a more particular description of which said draft is to the said jurors unknown," was only made in the indictment as to one of said drafts, and it was not necessary to prove that allegation to sustain the other charge. The allegations are not so repugnant as to render the indictment void. No advantage can be taken for repugnancy in the allegations of an indictment except by motion to quash, as the charge of repugnancy merely goes to the form of the indictment. Moore's Crim. Law, sec. 833.

It is argued that the consideration which moved Foulkes to part with the possession of said draft was the safe custody of it by Lodavine and not the promise of marriage. The promise of marriage is clearly shown to be the real cause that moved Foulkes to make all his gifts to Lodavine, including the draft in question. Lodavine constantly reiterated her intention to marry Foulkes from the time of their engagement to the delivery of this draft by him to her. The time set by her at first, and constantly referred to by her afterwards, for the consummation of the marriage, was when her suit against the traction company should be settled. Foulkes was never led to believe that her pretended marriage contract would not be consummated at the time she named until after the draft was delivered to her by him. Her only cause given for a later postponement, or rather her excuse why she could not marry him, was the alleged suit against them by Ellen Roberts.

It was proper for the court to admit in evidence all of the gifts of Foulkes to Lodavine from the first to the last, and the facts surrounding those transactions, although some of them were more than three years before the filing of the indictment, in order that the jury might understand fully the purpose of those gifts by Foulkes as well as the intention of Lodavine in obtaining the same. It was also proper to show that she had gotten practically all the property and money of Foulkes that he had, not only to show the enor-

mity of her offense, but to further show that she knew that she had obtained all that she could get from him and abruptly terminated all negotiations or pretensions of carrying out her promise of marriage because he had nothing further in the way of property that she could obtain. Such evidence tended strongly to show that her only purpose in entering into the pretended marriage contract was for the unlawful purpose charged in the indictment. The court permitted counsel for the State, however, to extend this inquiry too far, when Foulkes was permitted to answer, "I am working for my board at my aunt's now," in answer to a question as to what he was then doing. The State had already shown that Lodavine had gotten practically all of his property, and his said answer could serve no further purpose except to stir up unnecessary sympathy in his behalf. It was also error to permit the court stenographer to read to the jury the testimony of the deceased witness, Ellen Roberts, given at a previous trial, that she did not at any time bring a lawsuit against the prosecuting witness, J. Marion Miller and Lodavine Miller for $50,000, or for any other sum, without further proving by the said witness that she did not bring such a suit against Lodavine and Foulkes, as the record nowhere discloses that either Lodavine or J. Marion had said or claimed that she had brought such a suit against all three of them. The foregoing evidence must be regarded, however, as harmless error. Error which does not materially affect the result of the trial is not reversible error. The other errors assigned on the admissibility of evidence are not well taken and have already been sufficiently answered in this opinion.

Plaintiffs in error's counsel also argue that the State's attorney, in his closing argument, made improper remarks and arguments to the jury, and that he called the attention of the jury to the fact that the defendants had not testified on the trial. We have examined the record carefully and do not find that contention sustained. Counsel for the State

did argue and make statements to the effect that their counsel had not explained certain letters introduced by them and had not explained other features of the evidence and had sought to evade and escape the plain issues in the case. At another point in his argument the prosecuting officer stated, "What defense has been offered in answer to the State's case? Have you stopped to give that inquiry? I repeat, what defense has been made in this case?" This is the nearest that the prosecutor came to stating that the defendants themselves had not testified. He had a right to state that the defense had made no denial of certain facts that were proved by the State and to argue to the jury the full force of the facts proved by the State. Such statements and argument are not in violation of the statute prohibiting the prosecutor from making reference to or commenting on the fact that the defendant did not testify. (*Bradshaw* v. *People,* 153 Ill. 156; *Lipsey* v. *People, 227* id. 364; *People* v. *Spira,* 264 id. 243.) The only argument made by the prosecutor that was not proper was his reference to the prosecuting witness as "a simple, foolhardy old farmer, robbed of his last penny, reduced to abject poverty, a pensioner on the bounty of his relatives, working for his board, where before he was worth $25,000." It was not a legitimate argument to make reference to the poverty of the prosecuting witness, which could serve no purpose except to arouse the sympathy of the jury, as has already been stated.

No reversible error was committed by the court on this trial. We do not see how a different verdict could have been returned by the jury after a careful and candid consideration of the evidence in this record.

Complaint is made that the court erred in the giving of two instructions for the People and in refusing a number of instructions offered on the part of plaintiffs in error. We have examined the record carefully as to the instructions both given and refused by the court. We find no error committed by the court in either the giving or refus-

ing of instructions. No. 1 given for the People is simply a copy of the section of the statute fixing the penalty for the confidence game, and instruction No. 2 is a definition of the confidence game that has been repeatedly approved by this court. The instructions refused by the court that were offered by the plaintiffs in error were all properly refused, either for the reason that they do not correctly state propositions of law applicable to the case or stated propositions of law that were covered by other given instructions.

For the reasons above given, the judgment of the criminal court is affirmed.                    *Judgment affirmed.*

---

(No. 11089.—Reversed and remanded.)
R. B. STODDARD, Plaintiff in Error, *vs.* DANIEL KEEFE *et al.*
Defendants in Error.

*Opinion filed April 19, 1917—Rehearing denied June 7, 1917.*